2025 IL App (1st) 240914
No. 1-24-0914
June 27, 2025

FIFTH DIVISION

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF D.F., a minor | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| (THE PEOPLE OF THE STATE OF ILLINOIS,) | | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22 J.D. 01851 |
| | ) | |
| D.F., | ) | The Honorable |
| | ) | Stuart F. Lubin, |
| Defendant-Appellant). | ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justices Mitchell and Navarro and concurred in the judgment and opinion.

**OPINION**

¶ 1       D.F., a 15-year old minor, appeals his adjudication of delinquency after a guilty finding

of first-degree murder and aggravated discharge of a firearm.  The decedent in this case was

seven-year old Akeem Briscoe, who was shot by a stray bullet while he stood in his bathroom

with his mother washing his hands.  After a sentencing hearing, the trial court committed

defendant to the Department of Juvenile Justice until his 21st birthday.

¶ 2       On this appeal, D.F. challenges the sufficiency of the evidence against him, but he does

not dispute that he was with David Cervantes and Joseph Serrano, as Cervantes and Serrano

fired shots at rival gang members in a nearby parked car[1]. D.F. claims on appeal that return fire from the intended victims was just as likely to have killed the decedent as the rounds that Cervantes and Serrano fired and, therefore, the State failed to prove him guilty beyond a reasonable doubt. The parties agree that the assailants, on the one hand, and the intended victims, on the other hand, were all firing .40 caliber Smith and Wesson rounds.

¶ 3 D.F. does not argue on appeal that his participation was insufficient to establish his accountability for the acts of his co-assailants; rather, he argues that he cannot be held accountable for the actions of third parties, such as the intended victims. The State does not dispute that D.F. cannot be held accountable for third-party actions, effectively conceding the point. See 720 ILCS 5/9-1 (West 2024) (under the revised felony murder rule, a defendant is liable for a death only if caused by the acts of the other felony "participant[s]"). Thus, at trial, the State had to prove beyond a reasonable doubt that the fatal bullet came from a gun shot by defendant, Cervantes or Serrano, rather than one of the intended victims who fired defensively. On appeal, we, as the reviewing court, consider whether any rational trier of fact could have so found.

¶ 4 To further his insufficiency argument, D.F. notes that the trial judge, as factfinder, misapprehended the ballistics evidence when the judge stated that there were three guns total: two 40-caliber Smith and Wesson guns and one 9-millimeter Luger. The State acknowledges that this statement by the trial judge was factually incorrect when none of the guns was a Luger, but the State argues that this mistake was "inconsequential."

¶ 5 In addition to his claim of insufficient evidence, D.F. argues that (1) his trial counsel was ineffective, (2) that, although no objection was made, the admission of Facebook

---

[1] There was also evidence that defendant was firing.

statements from allegedly unknown declarants constituted inadmissible hearsay and that the admission of these statements rises to the level of plain error under both prongs of the plain error doctrine; and (3) that, in the alternative, a police detective was not qualified to translate gang terms in a Facebook conversation and that, although there was no objection, this alleged error rises to the level of plain error under the first prong of the doctrine. In response, the State argues that the ineffectivness argument is largely a retooling of the insufficiency argument and that, to the extent that it is not, defendant has not shown either ineffectiveness or prejudice. The State argues further that the claims regarding the Facebook comments and the detective's testimony about the comments were forfeited and that, if defendant had objected at trial, the State could have elicited additional testimony to rectify the objection. For the following reasons, we affirm.

¶ 6                                    BACKGROUND

¶ 7        The petition for adjudication of wardship, filed on November 23, 2022, alleged seven counts. Defendant was found guilty by the trial court of counts 1 and 2, the first degree murder counts, and count 7, which alleged aggravated discharge of a firearm. The trial court stated that it made "no finding" on counts 3, 4, 5 and 6, the attempted murder counts for the four intended victims,[2] and the court merged count 2 into count 1.

¶ 8        Count 1 alleged that defendant committed first degree murder, in that defendant, "without lawful justification intentionally or knowingly shot the victim," the seven-year old Akeem. Count 2 alleged that defendant committed first degree murder in that he, "without

---

[2] The attempted murder counts concerned Jose Delvalle, Jimmie Jackson, Elio Esquivel and Marcus Pittman. The trial court said that it made no finding because: "Those people didn't testify." Delvalle and Pittman did testify at trial, although Pittman responded "I don't remember" to most of the State's questions.

lawful justification, shot the victim, Akeem Briscoe, knowing that said act created a strong probability of death or great bodily harm to Akeem Briscoe." The State proceeded under a theory of transferred intent, which is not challenged on appeal, as well as a theory of accountability. Count 7 alleged that defendant committed aggravated discharge of a firearm, in that he "discharged a firearm in the direction of another person." On appeal, defendant does not raise issues specifically directed at count 7.

¶ 9        On December 1, 2022, defendant was arraigned on the case at bar (no. 22 JD 1851). At the arraignment, an assistant public defender initially appeared, but private counsel appeared and stated that he was filing an appearance for this case, as well as for another pending case against defendant (22 JD 1844). The other pending case alleged possession of a stolen vehicle, namely, the black Kia that defendant drove on the day of the murder. The same private counsel then represented defendant throughout trial and sentencing, and he is the subject of defendant's current claims of ineffectiveness.

¶ 10        On January 19, 2023, the trial court noted that defendant now had three cases, including another possession of a stolen motor vehicle (22 JD 2050). The court noted that, although the case at bar was a murder case, the State had not filed a motion to transfer the case to adult court. The first case to be set for trial, case no. 22 JD 1844 (the black Kia case), had been set to begin trial on September 20, 2023, but the State was not ready. The trial court denied the State's motion for a continuance and so the State nol prossed that case. On November 29, 2023, the court held a trial in case no. 22 JD 2050, for the possession of a stolen black 2014 Hyundai Sonata. After listening to evidence and argument, the court found that the State had proven the charge beyond a reasonable doubt and entered a finding of delinquency. The trial court set for January 18, 2024, both the sentencing, as well as the trial in the murder case (22 JD 1851).

4

¶ 11    On January 12, 2024, the court heard argument on two pretrial motions filed by the State, seeking to admit (1) proof of other crimes, and (2) evidence regarding street gangs. The defense argued that the motions were untimely, and the court agreed, stating that it would rule on the motions during trial, when it would evaluate the need for this evidence in light of the other evidence presented.

¶ 12    The trial in this case and the sentencing in the vehicle case, both scheduled for January 18, did not occur then. The State was not ready for trial; and defense counsel argued that "it's been a long time," and that he was answering ready and demanding a trial. The trial court denied the State's request to do the sentencing. The case was continued, with the trial set for March 12, 2024, and the court released defendant from custody over the State's objection.

¶ 13    On March 12, 2024, the trial began. The trial consisted of hundreds of pages, and over a hundred exhibits, including a number of videos. We do our best both to summarize and to provide important details, while yet being as accurate as possible.

¶ 14    In its opening statement, the State argued as follows: On October 26, 2022, the day of the murder, defendant, who did not have a driver's license, left his home at 11:50 a.m. in a stolen car and spent the day driving around and hanging out with his friends, including Christopher Pacheco, known as Gordo. In the evening, defendant left Pacheco's house with his friends Serano and Cervantes looking for the four intended victims, who were parked behind the deceased's house on a parking pad in a silver Volkswagen. The intended victims' backs were to the alley, as defendant, Cerano and Cervantes snuck up from behind. The three assailants possessed a total of two guns. At 8:20 p.m. gunshots were heard, and the seven-year old deceased was hit as he stood in his bathroom.

¶ 15     The State argued that defendant was wearing a distinctive red hoodie and that various surveillance cameras tracked his movements as he ran from the scene. The red hoodie was later recovered at defendant's home. The State conceded in its opening that it did not know who shot the seven-year old deceased and, thus, the State was relying on an accountability theory:

> "The one thing I want to tell you that we do not have in this case, is we do not have the evidence of who actually pulled the trigger to shoot young Akeem Briscoe. We are not going to be able to prove that it was [defendant] who shot him. *** But, what we do have in Illinois is the law of Accountability. And what we will have is that they planned, they plotted and they worked together ***."

The State argued that on November 1, 2022, defendant was arrested getting into the same stolen vehicle that he had driven on October 26, 2022, which was a black Kia. Defense counsel waived opening statement.

¶ 16     The first witness, Deidra Misters, testified that, on the day of the offense, she lived in a town house on Potomac Avenue, in the Humboldt Park neighborhood.  In the back of her house was a yard, and in back of the yard were parking spaces.  Misters lived there with her three children, including her son Akeem, the deceased in this case.. After dinner, Akeem wanted to wash his hands, so she went with him into the bathroom. While she waited for him to finish up, she heard shots and heard her other children say that there was shooting.  Then she saw smoke and Akeem said "mom, I think I got shot."  When she checked him, he started bleeding. She tried to pick him up to carry him to the car, while yelling for her other children to call 911. Akeem dropped onto the kitchen floor, told her he was going to be okay, and then started throwing up. Her other children ran out to flag down the ambulance which they saw on the next block.  The ambulance took Akeem to the hospital, and Misters followed with her

other children. Akeem died that night at the hospital. After returning to her home, Misters realized that her kitchen window had a single bullet hole through it.

¶ 17    Misters testified that, several minutes after the shooting, and while her son was still on the kitchen floor, a neighbor named Elio came in her front door. The door had been left open by her children when they exited to flag the ambulance. Misters called Elio "the neighbor that they were shooting at" and said he lived two doors away. When Elio saw Akeem on the floor, Elio said "no, not him." Misters asked him to leave her house. On cross, Misters said she heard numerous shots but she was not keeping count.

¶ 18    The State next called Sarah McCarthy, defendant's mother. Before she testified, defense counsel stated that McCarthy was represented by counsel, that he did not know where McCarthy's counsel was, and that McCarthy's counsel had indicated that McCarthy intended to invoke the fifth amendment. Nonetheless, McCarthy was sworn and testified.

¶ 19    McCarthy testified that she lived with her mother, her sister and her two sons, including defendant. When asked if defendant was also known as DK, she said she did not know. She testified that defendant slept in the attic, and she slept in the basement. Defense counsel objected to her testifying without her counsel present, when the court did not know why he was absent. The objection was overruled. McCarthy answered a few more questions about where defendant attended school in the fall of 2022, and then her attorney arrived. McCarthy's counsel said that he had told the State that he objected to his client testifying on fifth amendment grounds. The State responded that she was not charged with any crimes. Her counsel then asked if the State was offering her "Use Immunity," namely, "that nothing she says today can be used against her." The State agreed to that, and the court so instructed the witness. However, the court denied her counsel's request to speak to her, because she was

already in the middle of testifying. McCarthy testified that defendant never had a driver's license and that they usually drove him to school or called an Uber. McCarthy had never seen her son driving a Kia.

¶ 20     Jacob Klontz, firefighter and paramedic, testified that he was dispatched to the scene due to a gunshot victim.  When he arrived, family members were waiting out front, and after he entered the front door, he saw an older woman applying pressure with bloody towels to the victim on the floor. Klontz's examination of the victim revealed a bullet hole in the victim's abdomen. Klontz applied an abdominal pad over the wound and carried the victim to the ambulance waiting outside which then transported them to the hospital.  On cross, defense counsel asked if Klontz observed any shell casings on the ground, and Klontz had not.

¶ 21     Malcolm Pittman testified that his nickname was "Man Man," and he was 20 years old. Pittman agreed that the State had shown him a video which depicted him exiting Tip Top Liquors.  The State showed him stills from that same video which he agreed showed him wearing a blue hoodie, standing next to a metallic grey car. When asked whether he had previously told a police detective that on October 26, 2022, he parked with friends behind the decedent's address, he said "I don't remember." Although Pittman then responded "I don't remember" to most of the State's questions regarding his prior statement, he did admit to being in a car with Elio, Jose and Rock on October 26, 2022, the day of the murder.

¶ 22     Sergeant George Kuzmanovski testified that on October 21, 2022, five days before the murder, he responded at 8:30 p.m. to multiple calls regarding shots fired on West Potomac Avenue and a traffic accident. After arriving, he observed a silver SUV with bullet holes that had crashed into parked vehicles. A quarter of a block away, he and other officers found shell casings.  Over the dispatch radio, he was informed that a gunshot victim had arrived at a

hospital a mile away, and he also learned that the vehicle was stolen. Other officers at the hospital spoke to the gunshot victim, Curmiller Hayes, who said he was shot in the vicinity of Le Moyne and Rockwell Streets, which was three blocks from the crash scene.

¶ 23         Sergeant Kuzmanovski testified that on October 26, 2022, at 8:15 p.m. he activated his body camera and responded to a call of a person shot on West Potomac. The dispatcher gave the wrong address but it was only a block off. On the correct block, there were four attached row houses and he entered the front door of the correct house. As soon as he entered, he heard yelling, screaming and crying. From the front door, he entered the living room and, straight back from that, was the kitchen where a child was on the floor, bleeding. After entering the kitchen, the bathroom was on the left. Emergency personnel came in behind him and immediately began administering first aid. After a woman explained that there was gunfire and a bullet struck the child in the bathroom, the sergeant noticed that there was no window in the bathroom but that there was a bullet hole in the kitchen window. He noted that there was a path that, if the bullet was shot through the window, it would go into the bathroom. On cross, the sergeant agreed that the window was a back window and faced north.

¶ 24         Antwon Williams testified that he was 19 years old, but he answered "I don't recall" to almost all of the State's questions. Defense counsel had no questions.

¶ 25         Taja Thompson testified that she was 22 years old, her nickname was Tay, and she lived in the Humboldt Park neighborhood. In October 2022, she knew Christopher Pacheco, nicknamed Gordo, whose home was a hangout for members and friends of the Campbell Boys gang. Thompson identified photos of four boys whom she knew as Gordo, JoJo, Duce and DK and she identified them as some of the people she hung out with in October 2022. When asked

if Duce was David Cervantes, she replied she knew only his first name, David. She identified defendant as DK.

¶ 26    Thompson agreed that she had previously watched a video showing herself entering Tip Top Liquors, which she testified was a neighborhood store. Defendant drove her there in a black Kia. The State then played Exhibit No. 23-A which showed her getting out of the car and then getting back into the car, in the back seat; and Exhibit No. 23-B which showed her inside Tip Top. On December 7, 2022, police showed her several photographs. Exhibit No. 24 depicted defendant in a red sweatshirt with Duce. Defense counsel had no questions.

¶ 27    Officer Malave, whose first name was not given, testified that he had been a police officer with the City of Chicago for 24 years. On October 21, 2022, at 8:30 p.m., he was working with a partner, when they were directed by a sergeant, first to an incident scene and then to a hospital to speak with a gunshot victim named Curmiller Hayes, The officer identified Hayes as the person in the photograph marked Exhibit No. 28. Defense counsel had no questions.

¶ 28    Jose Delvalle testified that he was 21 years old and that on October 26, 2022, the night of the murder, he was hanging out in a grey Volkswagen with three of his friends: Elio, Man-man and Rocco. Man-man's name is Malcolm Pittman. Elio was driving and they drove to the Tip Top Liquor store. Prior to testifying, he reviewed the videos in Exhibit Nos. 29 and 30 which showed him exiting the car, entering Tip Top and getting back into the car. Delvalle identified Exhibit No. 29A as a still photo of himself that day. After Tip Top, the four of them drove back towards Elio's house on Potomac Avenue and parked in back, on a parking pad. As they were hanging out and talking in the car, they heard gunshots, and Delvalle could not tell if the shots "were coming from the back, the front, the side." There were more than 20

10

shots. Delvalle was in the passenger-side back seat, and Man-man was in the driver's side back seat, next to Delvalle. Delvalle ducked almost under the seat. After the shots, all four ran toward the house. The State played Exhibit No. 32, the back-door video which showed the four of them running toward the house. Then Elio went out the front door to his neighbor's house. The State played Exhibit No. 33, which was a front-door video showing Elio exiting. Delvalle testified that Exhibit No. 33A, a still photo from the video, showed Elio looking scared and frightened. Defense counsel had no questions.

¶ 29 Officer Nick Berman, evidence technician, testified that he was called on October 26, 2022, to assist with a homicide crime scene, and he arrived after midnight on October 27. A fired bullet was recovered from inside the decedent's kitchen and a fragmented bullet, from the backyard. Near the front driver's side of the silver Volkswagen was a fired bullet. The rear hatch of the car had bullet damage. A total of 19 spent cartridge cases were collected. Sixteen of the spent cartridge cases were found by the rear porch and rear parking pad of an Evergreen Avenue house and in a nearby gangway. Evergreen Avenue runs parallel to Potomac Avenue, with an alley in between. Decedent's house fronts on Potomac Avenue and backs on to the alley running between Evergreen and Potomac. Two spent cartridge cases were found by the parking pad for decedent's house, near the Volkswagen, and one was found in a nearby backyard. On cross, Berman testified that it was approximately 20 to 25 yards from the fired cartridge cases by the Evergreen house to the "shot up" silver SUV on the parking pad behind decedent's house.

¶ 30 Next the State called Curmiller Hayes who testified that he was shot on October 21, 2022, five days before the murder at issue. Hayes testified that he was 19 years old, lived in the Humboldt Park neighborhood, and had an older brother named Elijah. On October 21, he

was shot as he was coming out of his friend Chris's house on Rockwell Street but he did not know if Chris's last name was Pacheco. Hayes said that his own nickname was CJ, and defendant's nickname was D.K. On November 1, 2022, after leaving Chris's house, Hayes was arrested as he entered a car with a couple of friends, including defendant. After his arrest, Hayes pled guilty to possessing a gun as a convicted felon. On October 21, 2022, after he was shot in the right arm, he went home and his mother took him to the hospital. Defense counsel did not cross-examine.

¶ 31    Jorge Ortiz, age sixty-five, testified that he lived on Rockwell Street. On October 22, 2022, at 8:30 p.m., he was in front of his house working on his car when he saw "two kids running through my gangway." It was light out, and there were street lights on, and there was nothing blocking his view. By his house, there are two gates: one goes to the basement, and the other goes to the back apartment. Chris, who is nicknamed "Gordo," opened the gangway gate for them, and they headed toward the back apartment. Chris and his father lived in the same building as Ortiz, which has five units. Ortiz had a front unit, and Chris lived on the first floor in the back. Ortiz noticed there was another person in the back, in addition to Chris and the two runners, but Ortiz could not see his face. The first person who ran through the gangway wore a white hoodie with a design, and the second person who ran had a hoodie with no design. Ortiz identified Exhibit Nos. 79 and 80, which were still photos taken on October 26, 2022, from a nearby surveillance video, as photos of the kids who had run through the gangway four days earlier, on October 22, 2022. Ortiz identified Exhibit No. 81 as a photo of Chris, or Gordo.

¶ 32    Ortiz identified Exhbit No. 82 as a photo of "Serrano," who Ortiz said was like a grandson to him. Ortiz also identified Exhibit No. 83, which was a still photo from a

surveillance video taken on October 26, 2022, on Rockwell Street, as a photo of Serrano, who was one of the two who ran through the gate on October 22. Ortiz identified Exhibit Nos. 84 and 85 as the two who ran through the gate on "October 26, 2022." (It is unclear whether this is a typo, but the transcript here reflects a different date for the day that the kids ran through the gate than the date previously stated in the testimony.) Ortiz stood up in court and identified defendant as one of the people he saw running through his gate "back in October 2022." Ortiz was asked whether he saw defendant and the other runner again after seeing them run through his gate on "October 26, 2022," and he replied that he saw them the next day.

¶ 33    Ortiz testified that, on October 29, 2022, at 9 p.m., he was home when he heard some shots. After hearing the shots, he saw defendant and Gordo shooting and then go back into Gordo's house. After the shooting stopped, Ortiz went out his front door and found some shells in front of his house.   Using a glove and a plastic cup, he picked up eight or nine shells and put them in a baggie. On November 1, 2022, Ortiz gave them to a detective as he was arresting defendant. Ortiz reviewed a photo showing three individuals inside of Tip Top Liquors, two of whom he identified as Gordo and an individual who ran through his gate.  However, he could not identify the third person.  On cross, Ortiz clarified that he had seen them shooting as he looked through his window.

¶ 34    Officer Anthony Pavone testified that, on October 30, 2022, he and his team looked for and located a certain stolen black Kia Forte.  On November 1, 2022, they located the Kia parked on Rockwell Street. When uniformed officers, including Pavone, approached, defendant and two others exited the car and ran.  Defendant exited from the driver's seat and ran with Donte Brown. The police ordered all to lay down, and defendant and Brown lay down about "a house south of the car."  However, Curmiller Hayes jumped the fence and began to

run. Pavone chased Hayes and all three were eventually arrested. Pavone returned to the Kia and found a cell phone on the driver's seat. Defense counsel had no questions.

¶ 35 Officer Gerald Lau testified that on October 30, 2022, officers observed Antwon Williams exit the stolen black Kia Forte and walk down Potomac Avenue. When a uniformed officer approached, Williams ran and Lau pursued. During the chase, Lau observed Williams drop a firearm. The magazine ejected from the firearm, and Williams picked up the firearm and continued to run. Lau recovered the ejected magazine. During the chase, Williams attempted to jump a gate but got caught on the gate and the firearm fell to the ground. Lau then recovered the firearm. An hour later, officers knocked on the door of Williams's residence and his mother let them in and they arrested Williams.

¶ 36 Officer Lau testified that, on November 1, 2022, he observed three people enter the stolen black Kia parked on Rockwell Street. When uniformed officers arrived, all three exited; one of whom was defendant. While Ortiz was on the scene during their ensuing arrest, Jorge Ortiz gave him shell casings in a plastic bag. Defense counsel had no questions.

¶ 37 Yanis Saavedra, the owner of the stolen 2019 Kia Forte, testified that she drove her car on October 22, 2022, to a friend's house and parked it at 6 p.m.. When she returned at 11 p.m. to where she had parked it, it was not there. She had not given anyone permission to drive her car and she called 911 to report it stolen. On November 1, 2022, when she viewed her car in police custody, it was all ripped up, dented and "destroyed." Defense counsel did not ask any questions.

¶ 38 Assistant State's attorney (ASA) Christopher Moss testified that on October 31, 2022, he did a videotaped interview of Antwon Williams, with Detective Kuri present. During the interview, Williams explained who "D.O." was. At that point, defense counsel objected on

hearsay grounds. The trial court overruled the objection stating that the questions were "to complete the impeachment of Antwon Williams." Once the objection was overruled, Moss testified that Williams stated that DK was another name for D.O. Williams stated that D.K, or defendant, was a member of a gang called the Campbell Boys who Williams hung out with. A person named Joseph, nicknamed "23." was part of the same gang. Defense counsel indicated that he had a standing objection to this line of questioning.

¶ 39        Moss testified that Williams identified the persons depicted in the following exhibits as follows: Exhibit Nos. 12, 14 and 16 showed the person known as "23"; Exhibit Nos. 13 and 15 showed D.O., or defendant; Exhibit No. 17 showed defendant and Deuce; Exhibit No 18 showed defendant, 23 and Deuce. In Exhibit No. 17, defendant was wearing a red hoodie. When the State sought to play Exhibit No. 96, the 25-minute videotaped interview of Antwon Williams, defense counsel objected, but his objection was overruled at first. The court did state that if there were any statements on the videotape that were consistent with Williams's testimony, the court would not consider them. After the State stopped the video at 25 minutes and 11 seconds, the State sought to admit it into evidence and defense counsel objected again. This time the court sustained the objection and did not admit the exhibit at this time (although the court subsequently reconsidered and admitted it the next day).

¶ 40        Tracy Konior, a firearms identification expert with the Illinois State Police, testified that she received a total of 19 fired cartridge cases which were all 40-caliber Smith and Wesson cases. The cases she received were already split up into three inventory numbers: 16 cases were part of one inventory; 2 were part of another; and 1 was part of yet another. Konior determined that the group of 16 cases were fired from two different guns, and the remaining

three cases were fired from a third gun. Of the group of 16 cases, 11 cases were fired from one gun, and five were fired from another.

¶ 41     Konior later compared the 19 fired cartridge cases with evidence from another case which involved the reckless discharge of a firearm.[3] The evidence in the other case included eight 9-millimeter Luger fired cartridge cases and two 40-caliber Smith and Wesson fired cartridge cases. Konior concluded that the two Smith and Wesson cartridge cases from the other case were fired from the same gun that had fired the five cartridge cases in the case at bar. On cross, Konior agreed that the 19 cases recovered in this case could not have been fired from the same gun.

¶ 42     On the next day of trial, March 14, 2024, the trial court began by reversing itself regarding Exhibit No. 96, the Williams interview, and admitting it. Defense counsel then sought to be relieved from the case, stating:

> "[DEFENSE COUNSEL]: Judge, after we left the court yesterday, my client engaged in some very egregious conduct. I've been in practice, I think this is my 69th year, tried over 150 juries, 25 in federal court, 1,000 benches, I have never had a client commit a crime that I can remember, an egregious crime that I can remember during the course of my wardship on matters before a court.
>
> In all good conscience, Judge, because of the conduct that I am understanding occurred, I cannot go forward comfortable with the fact that I'm very upset by the fact that he put himself in jeopardy to kill people, tried to get away from the police--"

---

[3] This separate reckless discharge case involved defendant and Pacheco and the shell casings recovered by Jorge Ortiz.

16

The trial court interrupted to ask if counsel was referring to defendant's new case that he was just arrested for, and counsel said yes. The court insisted that the new case had nothing to do with this case. Defense counsel responded:

> "[DEFENSE COUNSEL]: I can't get it through my mind that I want to represent somebody that conducts himself under my watch in that way. And I don't think I can adequately represent him. I'm going to ask for--."

The trial court interrupted again and told him that they had "to finish the trial." Counsel then asked for a mistrial, which was denied.

¶ 43    The State then asked, in light of the trial court's reversal and its decision to admit Exhibit No. 96, that defense counsel be given an opportunity to cross-examine ASA Moss, which the trial court denied. Defense counsel then said "I can't think straight. So I can't think that I have any questions." In the now admitted interview from October 31, 2022, Williams stated that he hung out regularly with Joesph, also known as 23, and defendant, also known as DK or Dio, who were a part of the Campbell Boys gang. Williams identified various photos as depicting defendant or Joseph, including stills from surveillance videos depicting defendant in a red hoodie. Williams acknowledged that he was at a party with them on October 29, 2022. At some point in the early morning hours, defendant gave Williams a ride in a black Nissan. On October 30, 2022, Williams was arrested on a gun charge.

¶ 44    The State's next witness was Detective Brendan McNally who testified that, by using a system of license plate readers that are placed throughout the city, he was able to track the path of the stolen 2019 black Kia. He was then able to match up the points provided by the license plate readers to cameras known as "PODs," or police observation devices, that are also posted in various locations. McNally identified Exhibit No. 97 as a disc containing POD

camera video footage for the Kia on October 26, 2022, which was admitted into evidence without objection. Exhibit No. 95 was a still photo from a POD camera depicting the 2019 Kia, with the person in the driver's seat wearing red clothing. That camera was three or four blocks from the crime scene.

¶ 45    McNally also received an assignment to do a data extraction for the cell phone recovered from the driver's seat of the stolen Kia, and a search warrant authorizing the extraction. McNally did the extraction using two different computer systems to ensure the fullest extraction. Lastly, he received an assignment to do a Facebook return for a person with the handle name of "Luh DK." A search warrant was served on Facebook which then returned a series of compressed folders which were, in turn put in a system to create a readable format. Defense counsel objected on the ground that he had no knowledge of a court order authorizing a search of the phone. The court asked the State if there was a search warrant and when the State said yes, the court overruled the objection. Defense counsel also objected to the Facebook admissions which was overruled.

¶ 46    Elizabeth Vasquez testified that she lived in the Humboldt Park neighborhood. On October 26, 2022, at 8 p.m. she was standing on West Evergreen Avenue having a cigarette, when she heard what she thought, at first, were fireworks. But she looked to her left and did not see any fireworks and thought "not fireworks. Gunshots." Then she saw individuals running through the gangway and she left. Vasquez heard a total of about 20 to 25 shots that came in two rounds of gunfire. In the first round, she heard 10 to 15 shots, and then in the second round, she heard four or five shots. At the exact same time that she heard the second round of gunfire, she saw two individuals running toward Rockwell Avenue. They were four to five houses down from her. Vasquez did not see their faces but did notice that one of them

was wearing a bright-colored red or orange hoodie. As the individual in the red or orange hoodie was running, he was looking back and firing his gun. The State handed her a map marked Exhibit No. 103, on which she put a circle where she was standing and an X where she saw the individuals running out of the gangway. The map was moved into evidence without objection. The police previously showed Vasquez Exhibit No. 104, which was a still photo from which she had identified the people who she saw running. The still photo showed three figures, and she circled two, including one figure in red clothing. It was admitted without objection. Defense counsel had no questions.

¶ 47     Kevin Dwyer testified that he lived in the Humboldt Park neighborhood and that on October 26, 2022, at 8:15 p.m. he was walking home with his dog down Rockwell Street when he heard gunshots. Five or ten seconds later, he saw "three guys run out onto Rockwell" from Evergreen Avenue, about 100 feet from him. The three guys were wearing a red hoodie, a black hoodie and a gray hoodie, but he could not make out their faces. The State showed him Exhibit No. 105, from which he said he was able to identify the color of the hoodies. Defense counsel had no questions.

¶ 48     Dr. Benjamin Soriano, an assistant medical examiner and forensic pathologist, testified that he performed the autopsy on the deceased on October 28, 2022, and concluded that he died from a gunshot wound to the abdomen. Defense counsel had no questions.

¶ 49     Detective Dan Warzynski testified that on November 2, 2022, at 4 p.m., he went to a location where the stolen black Kia had recently been seen and noticed that there were houses with house cameras. The detective and his partner knocked on the door of a home with four cameras and were asked to come back later which they did. A resident directed them to a digital video recorder that takes the recordings from the cameras and puts them into a digital

format on a hard drive. After reviewing the videos, they saw the vehicle they were looking for and they copied the videos onto a USB drive and then onto a disc which was admitted into evidence as Exhibit No. 114. Defense counsel had no questions.

¶ 50    Detective Nicholas D'Alessandro testified that, on October 26, 2022, he went to the homicide scene to canvass the area for locations with potential video evidence. A neighbor, who lived next door to where the decedent lived, had both front and back door cameras that were set to record upon sensing motion. Video clips were downloaded to discs that were admitted into evidence as Exhibit Nos. 31, 32 and 33 and played for the court, without objection. Exhibit No. 31, from the back door camera, showed the intended victims walking toward and into a silver car parked in the alley. Exhibit No. 32, which was a clip recorded at 8:21 p.m. on October 26, 2022, showed individuals running from the direction of the alley, where the silver car was, and toward the camera. Detective D'Allessandro testified that the clip showed one of them holding a handgun. Specifically, the clip showed that an individual wearing a black hoodie was raising his hand with the gun pointed back toward the alley.

¶ 51    Christopher Pacheco testified that he was 19 years old and had lived his whole life on Rockwell Street in Chicago. Pacheco answered "I don't remember" or "I don't know" to most of the State's questions, including questions about his prior grand jury testimony. Defense counsel had no questions.

¶ 52    Detective Jennifer Westerkamp, an over 11-year veteran[4] of the Chicago Police department, testified that she was present at the station on November 1, 2022, when defendant was arrested on a stolen vehicle charge, along with Curmiller Hayes. The detective testified

_____

[4] Defendant mistakenly stated in his initial appellate brief that "[n]o testimony was offered as to how long she had served on the police force." However, in his reply brief, he conceded that she had, in fact, testified "to her extensive history on the police force."

that she had worked her entire career in the same geographic area: first, in Area North; and then, in Area 5 when Area 5 was created. Her assignments for those areas were principally in "Violent Crimes" and "Homicide." When asked to explain what a particular slang term meant, she testified that she knew what it meant based on her "experience on the street and as a detective," as well as her experience interviewing offenders and witnesses.

¶ 53     Detective Westerkamp testified that, the same day that defendant was arrested, a search warrant was obtained for the phone found on the driver's seat of the stolen vehicle. The extraction of data from the phone was done by Detective McNally, and Detective Westerkamp reviewed the results on November 2. Detective Westerkamp identified Exhibit No. 7 as the phone "recovered in the car that [defendant] claimed to be his." The State was about to ask Detective Westerkamp about the phone's text messages with a number labelled "Mom," when defense counsel objected. The court stated that it took the objection under advisement.

¶ 54     Detective Westerkamp testified that "Mom" sent a text message on October 22, at 7:34 p.m., suggesting that defendant should stay home because he "almost got shot last night." Defendant's reply was: "OMG." These messages were sent the day after Hayes was shot. On October 23, 2022, there was a continuing text message conversation with "Mom" from 9:53 a.m. to 4:20 p.m. Defense counsel noted his continuing objection, and the court overruled the objection without explanation. In this conversation, "Mom" said that she had seen a gun on his waist before and saw it under his pillow yesterday, that she wanted the gun and shell casings out of the house, and that if she saw the gun again, she was going to call the police and give it to them. In reply, defendant denied having a gun, but agreed to get rid of the shell casings when he got home. The phone reflected that the user had accessed news articles about the murder on October 26, 2022, at 10:27 p.m., and on October 28.

¶ 55          Detective Westerkamp testified that a preservation request was sent to Facebook, to preserve the Facebook pages associated with the Facebook ID number found on the phone, and that a search warrant was obtained for them. The phone also had a series of photos, marked Exhibit No. 123, with one to four individuals next to a black Kia. The photos also showed a blue crossbody bag with the word "Backwoods." The detective testified that defendant was seen wearing that bag after the murder, and one of his acquaintances was seen wearing it before the murder. Exhibit No. 123-A was a photo of defendant, Cumiller Hayes, David Cervantes, and a fourth person flashing signs or symbols with their hands. Defense counsel had no questions.

¶ 56          Detective Westerkamp was recalled the following day and testified that, after reviewing defendant's preserved Facebook account, including Messenger messages, she was able to identify nicknames associated with people involved in this case. The detective testified that Curmiller Hayes's nickname was: "Lil C" with "32." She explained that 32 was a reference to the Campbell Boys, since "C" was the third letter in the alphabet and "B" was the second. Joseph Serrano's nickname was "Jojo Thirty-Two." David Cerevantes's nickname was "Duce," and his Facebook username was "Artesian N. Lamoyne." On appeal, defendant claims, among other things, that his constitutional right to confront the witnesses against him was violated "where the State did not provide any authenticating evidence establishing that the Facebook usernames 'Lil C', 'Artesian N LaMoyne,' and 'Jojo Thirty-Two' were actually associated with" Cumiller Hayes, David Cervantes, and Joseph Serrano.

¶ 57          Detective Westerkamp testified that she had assisted in creating a Powerpoint presentation to present the results of her review of defendant's Facebook messages in this case, which was on a disc marked Exhibit No. 127. The court asked defense counsel "[a]ny

objection?" and he replied "[n]o objection." A printout was marked Exhibit No. 127A, and was also admitted after defense counsel volunteered: "No objection." When the prosecutor asked, "if it would be okay with the parties if the detective refers to [Lil C 32] as Hayes, Jojo ThirtyTwo as Serrano, and Artesian N. La[M]oyne as Cervantes," defense counsel responded that he had no objection.

¶ 58     Detective Westerkamp testified about the messages which occurred after Hayes was shot on October 21, 2022. The messages on the various days are numerous; we mention only a few here to illustrate the issues on appeal. Defendant messaged at 9:55 p.m. that "[t]hey shot at us in the car," that "we crashed," and that "I hopped out, [and] grabbed my gun." Hayes replied later that they had "no chop" and "[n]o switch." The detective replied that, based on her experience that the word "chop" means a gun, and that a switch is a device installed on a gun to make it fully automatic so that that it can fire more rounds faster. On appeal, defendant argues, among other things, that Detective Westercamp was not qualified to translate gang terms appearing in the Facebook Messenger conversation, specifically noting the terms chop, switch, 32, nation, pipe, shells, hollow tips, patch and hoop, and the phrases "blew at us" and "throwing a basketball." Defense counsel raised no objection at trial to the detective's explanations of these terms and phrases, which we note as they occur in the testimony.

¶ 59     On October 21, 2022, defendant used the word "[n]ation," in a message, and the detective explained that, in this context, it was an oath indicating that defendant was swearing on his allegiance to his gang. Hayes, Serrano and defendant discussed the fact that defendant was scared. Another user said "[t]hey just blew at us," and the detective explained that meant that they shot at them. In a later message, Hayes said: "He tossed out of nowhere . I tossed back." The detective explained that "toss back" meant that he shot back.

¶ 60 On October 22, 2022, Hayes stated: "He lucky he hit me. I would have kept throwing the basketball." The detective testified that "throwing the basketball" meant "shooting a gun." Later, Serrano asked "How many shells you got?" and he also referred to "pipes." The detective explained that shells meant bullets and pipes meant guns. Serrano stated that defendant had 8 shells, and that Serrano had 4 for defendant, so that defendant now had 12 shells.

¶ 61 On October 22, 2022, defendant stated, among other things: "My pipe in the hood." A Facebook user named "Three Two Bobby" referred to "[h]ollow tip 40's" and said "[g]ood day to patch up." The detective explained that a hollow tip bullet opens when it hits the body causing more damage than a regular bullet and that to patch meant to put holes in someone by shooting them. Defendant asked at one point if someone filled his clip up, and the detective explained that was the magazine for the gun.

¶ 62 On October 23, 2022, ThreeTwo Bobby asked: "Who want to hoop today?" The detective had previously explained that a basketball referred to a gun, and now she explained that hoop referred to going shooting.

¶ 63 On October 24, 2022, at 8:32 a.m., in response to messages that other people knew that they had been shot at and that they were going to catch who did it, defendant replied: "I don't want nb to know about that. I want to move in pure silence." The detective explained that moving in pure silence meant sneaking up on them. When someone indicated that another "steam," was needed, the detective explained that steam meant a gun. At 8:32 a.m., defendant said: "Got one." Hayes at 8:32 a.m. said "I want to catch them on feet," and defendant said "I don't want to play in a car." The detective explained that meant that they want to walk up and shoot them, rather than shooting in a drive-by. On October 25, 2022, at 9:20 a.m., defendant

sent a photo of himself in the Kia holding his hand, in what the detective testified, was a gang sign.

¶ 64        On October 26, 2022, shortly before the shooting, defendant messaged that "we" are "going to be there in a minute,' and a few minutes later, he tagged Hayes in a message to open the door. After the murder, Hayes sent a message at 8:34 p.m. to "[g]et back," and defendant sent a one-word message at 8:43 p.m.: "Police." At 8:56 p.m., defendant messaged: "Good job, twin." Hayes at 8:56 p.m.said: "He got his stripe." The detective testified that when a gang member shoots someone, he has earned his stripe in the gang. In response to a question whether defendant "threw" his, defendant replied that Cervantes "[t]hrew mine." The detective explained that meant that Cervantes shot defendant's gun. At 9:16 p.m., Serrano messaged: "Just did it like a movie." At 9:18 p.m., Serrano said: "Boy, they knew it was us. We seen them at Tip Top [Liquors]." At 9:36 p.m., defendant messaged: "Proud of little Duce Duce." Duce was Cervantes's nickname. R 680.

¶ 65        On October 26, 2022, in response to a message that everybody should delete their messages and stop talking, defendant replied: "Literally." At 10:06 p.m., Serrano asked: "Man, who got hit though." At 10:47 p.m., defendant messaged that a seven-year old was shot by a stray bullet. At 10:48 p.m., Hayes replied: "But it could have been dude them. They came out the car tossing without looking." At 10:48 p.m., defendant messaged: "Look at the news." At 10:49 p.m., defendant messaged "I ain't do shit" and "[j]okes on you."

¶ 66        Defense counsel had no questions.

¶ 67        Detective Martin Brennan testified that pod cameras are portable video units set up on various street corners in the City of Chicago. On October 27, 2022, he and his team canvassed the area for cameras, including front-door cameras. The police obtained video of the offenders

25

going to and fleeing from the scene, and of defendant leaving his house wearing a red hoodie and entering the stolen Kia. After reviewing all the videos, the police made a "Camtasia," which the detective explained is the name of an editing program that permits them to make a compilation or movie in chronological order. It also permits them to zoom in or out. The police did not put full videos into the movie, but rather selected the times that they wanted.[5] The compact disc containing the Camtasia video which the police put together was admitted into evidence as Exhibit No. 135. Defense counsel volunteered: "No objection."

¶ 68     At the beginning of the video, defendant exited his residence at 11:52 a.m. on October 26, 2022, wearing a red hoodie and blue jeans, and walked down the street to the stolen Kia. Defendant then drove the Kia, without a front license plate and with a broken rear passenger window along various streets, eventually parking near Christopher Pacheco's residence on North Rockwell Street. The detective then testified that videos showed defendant entering and exiting that residence at many times throughout the night, and it was also on this block that defendant was later arrested.

¶ 69     The video shows that, at 3:54 p.m. on October 26, 2022, three people exited the parked Kia and walked through the gate to Pacheco's residence, including defendant who exited from the driver's seat wearing the red hoodie. After a 24-minute time gap, the video shows one girl and three boys near the gate, including defendant. Then defendant and others are shown walking around. Eventually, defendant, and the two people he arrived with, entered the Kia

---

[5] The first video in the Camtasia was Exhibit No. 1, which was already in evidence. The pod camera videos were already in evidence as Exhibit No. 97. Detective Brennan testified that the police pulled well over 80 pod cameras and used four of them in the Camtasia. Exhibit No. 102, 129, 130 and 133 contained video footage from door cameras on North Rockwell Avenue. Exhibit Nos. 31, 32 and 33 contained footage from door cameras next to the decedent's home. Exhibit No. 128 was footage from Tip Top Liquors. Exhibit No. 131 and 132 contained footage from homes on West Hirsch Street, and Exhibit No. 134 contained footage from a former Chicago Public School on West Hirsch.

with defendant in the driver's seat and drove to West Lake Street, arriving at 4:51 p.m. The video shows that, at 7:19 p.m., Christopher Pacheco, Cervantes and Serrano exited Pacheco's residence and walked to Tip Top Liquors. Camera footage from the outside of Tip Top at 7:23 p.m. shows the silver Volkswagen, as well as Malcolm Pittman and Jimmy Jackson, who were two of the occupants in the Volkswagen when the Volkswagen was later shot at. Video from inside the store subsequently shows Serrano and Pacheco inside. Video from outside the store then shows that at 7:29 p.m., the silver Volkswagen was no longer outside, and Serrano, Pacheco and Cervantes exited the store. The three of them then walked back to Pacheco's residence. At 7:55 p.m., the black Kia pulled up and parked by Pacheco's residence and three individuals exited the car and entered the gate by Pacheco's residence. Six minutes later, at 8:01 p.m., the three exited Pacheco's residence and walked southbound on Rockwell and then turned around and walked back north. The detective identified these three as defendant, Cervantes and Serrano, and noted that Cervantes was in a gray sweatshirt, Serrano was in a black hoodie, and defendant was in the red hoodie. The detective explained that during the trip to Tip Top, defendant was not present, but that after 8 p.m., defendant was present, but Pacheco was not.

¶ 70        The video shows that at 8:03 p.m. Cervantes was carrying a sling bag, which was the same sling bag that Cervantes was seen carrying earlier in video at Tip Top. However, at 8:08 p.m. defendant was carrying the sling bag. The three then walked south from Rockwell Street to Hirsch Street. After reaching Hirsch and Rockwell, the three walked in a sideways U shape: walking west on Hirsch, south on Washtenaw Avenue, and east on Evergreen Avenue--back to Rockwell. The video then showed the three walking south again on Rockwell at 8:17 p.m., toward Potomac Avenue. However, at 8:18 p.m., they walked back north on Rockwell, toward

Evergreen and turned left, or west, onto Evergreen, which the detective testified was right behind the decedent's home.

¶ 71    Detective Brennan testified that the next clip was from a home on Rockwell Street, and it captured the sound of the gunfire at 8:21 p.m. Next, the clip from the Rockwell home shows the three running north on Rockwell Street. The detective testified that Serrano was in the lead, Cervantes was trailing Serrano, and defendant still had the sling bag.

¶ 72    Detective Brennan testified that the next clip goes back to 8:21 p.m. and was from a backdoor camera at a home next to decedent's home. The detective explained that the clip does not show the intended victims exiting their vehicle, because that would have been out of the range of the camera's motion detector. However, it does show them running.

¶ 73    Detective Brennan testified that the next clip was from a camera on Hirsch that showed defendant and Cervantes running north on Rockwell at 8:22 p.m., one minute after the shooting. The detective explained that Serrano, who was in the lead, was out of view. Next, the detective explained that the group running north on Rockwell turned to run west on Hirsch, and that the ensuing set of clips were from cameras located at the old Von Humboldt school These clips show that Serrano is still in the lead, that Cervantes is following him, and defendant is the last one, still carrying the bag. From Hirsch, the group turned north onto Talman Street at 8:22 p.m. The detective explained that this block of Talman was directly behind the block where Pacheco lived on Rockwell. The three then jumped a fence by the school and ran through a parking lot, with defendant still carrying the bag, heading toward Rockwell. The video ended with the three of them hopping a wood fence, to an alley that went behind Pacheco's residence which, the detective testified, had a back gate.

¶ 74    Defense counsel had no questions.

28

¶ 75    Detective Homero Martinez was qualified as an expert in the criminal street gangs of Chicago. Defense counsel volunteered that he had no objection, and the court accepted the detective as such. Detective Martinez testified that the primary gang in the Humboldt Park area was the Maniac Latin Disciples which had five factions, including the Campbell Boys. The detective testified that on October 21, 2022, a few days before the murder, Curmiller Hayes was shot. At that time, there were two factions in conflict, namely, the Disciples and the Campbell Boys., and they were still in conflict on the day of the murder, October 26, 2022.

¶ 76    Judge Sharon Kanter, an associate judge with the Circuit Court of Cook County, testified that, prior to becoming a judge, she was an assistant State's attorney (ASA). As an ASA, she brought Christopher Pacheco in front of the grand jury on December 6, 2022, and she identified Exhibit No. 139 as a transcript of his grand jury testimony. Before the grand jury, Pacheco testified that on October 26, 2022, at 7:30 p.m., he walked to Tip Top Liquors with two of his friends, Joseph Serrano and David Cervantes. When they exited the store, Pacheco saw a group of guys he knew from the neighborhood who were standing by their car and "mean mugging" Pacheco and his friends. By "mean mugging," Pacheco explained that they were trying to scare Pacheco with mean looks and staring. After leaving Tip Top, Pacheco and his friends walked back to his house on North Rockwell, where they were later joined by CJ, Elijah and defendant. A few days earlier, CJ had been shot in the arm. Before the grand jury, Pacheco identified and signed the backs of photos of Cervantes, Serrano and defendant. Defense counsel had no questions.

¶ 77    Detective Caesar Kuri testified that he responded with his team on October 26, 2022, to a call regarding a 7-year old who had been shot. When he arrived at the minor's home, the minor was already at the hospital. In the kitchen, the detective observed a bullet projectile on

the floor and a bullet hole in the kitchen window, directly across from the bathroom. After exiting the kitchen through the back door, he entered a grassy backyard, where he noticed a bullet fragment in the grass. After exiting the yard, he noticed a shot-up gray Vokswagen on the parking pad. Near the Volkswagen, he noticed two shell casings. Next, the detective proceeded across the alley toward Evergreen. In the alley, near an Evergreen home but directly across from the decedent's home, he noticed numerous cartridges. The detective explained that the rear of the Evergreen home was divided by an alley from the decedent's home, and "in between them" was the Volkswagen. The detective noticed additional shell casings on the rear porch of the Evergreen home and in the gangway of the house. The detective then walked to the rear of a neighboring house, two doors down from the decedent's house, and found one lone shell casing.

¶ 78        Detective Kuri testified that they recovered video footage from a backdoor camera from the house next to the decedent's home, which showed initially three individuals running and then a fourth who was "pointing a handgun towards the alley." They were running south, into the yard where the lone shell casing was found, which was two doors down from decedent's home.

¶ 79        Detective Kuri testified that, after viewing that video footage, he went to the house two doors down from decedent's home and knocked on the door. The detective testified that Hector Salgado, who answered the door, denied at first that he knew anything about the incident but then admitted that the individuals had entered his apartment. They were the four intended victims, namely, Jose Delvalle, Jimmie Jackson, Elio Esquivel and Marcus Pittman. who the detective then took into custody. However, they were later released when the police determined that they were the intended victims. On November 21, 2022, Detective Kuri

executed a search warrant for defendant's home and, from defendant's bedroom, the police recovered the red hoodie with a design on it that defendant was seen wearing in various surveillance videos. The detective said that defendant's grandmother told them that the room was defendant's room.

¶ 80        Detective Kuri identified Exhibit No. 141 as a chart that he prepared to summarize the 19 recovered shell casings. On the chart, the colors green, blue and yellow represented the three different handguns that the casings were fired from.  With respect to the 3 items in green, which were all fired from one handgun, one casing was found in the rear yard of the house two doors down from decedent's home and two were on the parking pad behind decedent's home. As to the 11 items in blue, which again were all fired from one handgun, they were found in the Evergreen area across from decedent's home, and the 5 items in yellow, all fired from a third handgun, were also found in the Evergreen area.

¶ 81        On cross-examination, Detective Kuri acknowledged that he had watched a video of two individuals jumping over a wooden fence but neither had a red "jacket."

¶ 82        After the State rested, defense counsel moved for a directed verdict which he did not argue. After his motion was denied, defense counsel rested and the State gave its closing argument.  Defense counsel argued that the State failed to prove beyond a reasonable doubt that defendant was "responsible for a bullet that went through that window."  Counsel argued that the State's "own evidence showed only two individual[s] jumping over a fence" and  that "there was nobody who jumped over the fence with a red jacket."  Counsel argued that it was unclear whether the victims were the ones who jumped over the fence since there was not good facial recognition at that point. Lastly, counsel argued that conversations before and after did not create legal responsibility, but rather only an agreement could do that.

¶ 83          In rebuttal argument, the State pointed out that there were three fences: (1) the fence behind the decedent's house that one or two of the victims jumped as they fled from the shooting; (2) the fence behind Von Humboldt School, which defendant in a red sweatshirt and his two friends jumped; and, lastly, (3) the fence by Christopher Pacheco's house. The State further argued that, in Pacheco's grand jury testimony, which was admitted into evidence, Pacheco identified defendant as one of the three who came into his house.

¶ 84          The trial court's ruling, which attempted to list events and sources, took over ten pages. As already noted, the trial court found defendant guilty of counts 1 and 2, the two murder counts, but merged count 2 into count 1. The court made no finding on counts 3 through 6, the attempted murders of the victim, and also found defendant guilty of count 7, aggravated discharge of a firearm. At the sentencing hearing on April 23, 2024, the court noted that this offense involved a mandatory sentence and that defendant was extremely lucky to be in juvenile court. After the sentencing hearing, the trial court committed defendant, as required, to the Department of Juvenile Justice until his 21st birthday. No issues are raised on appeal regarding sentencing. Defendant filed a timely *pro se* notice of appeal on the same day as his sentencing, and this appeal followed.

¶ 85                                    ANALYSIS

¶ 86                                   I. Sufficiency

¶ 87          Defendant claims, first, that the State's evidence was insufficient to prove him guilty of murder, because the State allegedly failed to prove beyond a reasonable doubt that the bullet that killed the decedent came from one of the two guns fired by him or his two co-offenders.

¶ 88          When considering a challenge to the sufficiency of the State's evidence, a reviewing court must view the evidence in the light most favorable to the State and then decide whether

any rational trier of fact could have found the offense proven beyond a reasonable doubt. *People v. Jackson*, 2020 IL 124112, ¶ 64; *People v. Wright*, 2017 IL 119561, ¶ 70. This is a tall mountain for any appellant to climb.

¶ 89   Our mandate to consider all the evidence does not require a written " 'point-by-point discussion of every piece of evidence,' " with " 'every possible inference that could be drawn therefrom.' " *People v. Jackson*, 2020 IL 124112, ¶ 71 (quoting *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007)). Such a dissertation " 'would effectively amount to a retrial on appeal.' " *Jackson*, 2020 IL 124112, ¶ 71 (quoting *Wheeler*, 226 Ill. 2d at 117). Further, it is axiomatic that this court may affirm on any ground appearing in the record, whether or not the trial court relied on that ground. *People v. Gomez*, 2021 IL App (1st) 192020, ¶ 65.

¶ 90   For the murder, defendant was sentenced on count 1, the "intent to kill" charge. Our state's first-degree murder charge provides in relevant part that: "A person who kills an individual without lawful justification commits first degree murder, if in performing the acts which cause the death: (1) he or she intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." 720 ILCS 5/9-1 (2022). For the purposes of the sufficiency claim, defendant does not dispute that he intended to kill or do great bodily harm to another; rather he claims that the State failed to prove beyond a reasonable doubt that either he, or someone for whom he is accountable, performed the act, i.e. shot the bullet, that caused the death.

¶ 91   A person is accountable if "either before or during the commission of an offense, and with intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(a)(1)(c) (West 2022). "When 2 or more persons engage in a common criminal design or

33

agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts." 720 ILCS 5/5-2(a)(1)(c) (West 2022). For the purposes of his sufficiency claim, defendant does not deny either that there was a common design or agreement or that he is equally responsible for the consequences of the acts of himself, as well as his co-offenders, Cervantes and Serrano.

¶ 92       Defendant's sufficiency claim on appeal is a very limited one: he claims only that the State failed to prove beyond a reasonable doubt that he, Cervantes or Serrano fired the bullet that killed seven-year old Akeem. However, that is not the question before us, the reviewing court. The question for *us* is whether any rational factfinder could have found so, and the answer to that question is unequivocally yes.

¶ 93       There is limited support for defendant's argument in the record. Jose Delvalle, one of the four intended victims, testified at trial that he was hanging out and talking with three of his friends in the grey Volkswagen parked behind decedent's house, when they heard gunshots, could not tell if the shots "were coming from the back, the front, the side." Delvalle ducked almost under the seat and, after the shots, all four ran toward the house. Based on this testimony, defendant hypothesizes that, since the victims did not know what direction the assailants' shots were coming from, it is conceivable that the victims could have fired toward the house on Potomac, rather than toward the assailants on the Evergreen side of the alley.

¶ 94       The problem with this argument is that there is little to no evidence in the record that the victims actually started firing before ascertaining where the assailants were--except for an after-the-fact comment by Hayes who was not there. At 10:47 p.m., defendant messaged on Facebook that a 7-year old was shot by a stray bullet. At 10:48 p.m. on October 26, 2022,

Curmiller Hayes replied: "But it could have been dude them. They came out the car tossing without looking." Again, Hayes had no personal knowledge of this as he was not there at the time of this shooting.

¶ 95        Contrary to the hypothesis that the victims were firing every which way, including at the building, the video evidence suggests otherwise. Both Detective Kuri and Detective D'Allessandro testified about video footage (Exhibit 32) that the police recovered from a backdoor camera, from the house next to the decedent's home. At 8:21 p.m. on October 26, 2022, around the time of the shooting, the video showed the four victims running: first, three individuals, and then a fourth, who was raising his hand with a handgun pointed back toward the Evergreen alley--in other words, toward the assailants and away from decedent's home. If the intended victims were running behind the decedent's home and the assailants were firing at the intended victims, it is more probable that the assailants' bullets would enter the decedent's home.

¶ 96        The kitchen was at the back of decedent's home. Sergeant Kuzmanovski testified that the kitchen window, through which the lone fatal bullet had come, faced north, i.e. facing toward where the assailants were in the Evergreen alley.

¶ 97        Elizabeth Vasquez testified that on October 26, 2022, at approximately 8 p.m., she was standing on West Evergreen, having a cigarette, when she heard two rounds of gunfire. At the exact same time that she heard the second round, she saw individuals running, and she saw that the individual in a red or orange hoodie was looking back and firing his gun.[6] Firing back would have been back in the general direction of the decedent's home.

_____

[6] The Facebook messages indicated that Cervantes was firing defendant's gun. However, with respect to the claim defendant raises, which assailant was firing is less important than in which direction they were firing.

¶ 98        In addition to the directions in which the two groups were both motivated to shoot and were actually observed shooting, the sheer numbers reduce the likelihood that the fatal bullet came from the lone gun fired by the victims.  Detective Kuri, during his testimony, summarized the guns and locations of the 19 recovered shell casings. Eleven of the 19 casings were fired from one handgun and recovered in the Evergreen area across from decedent's home.  Five additional casings, which were fired from one additional gun, were also found in the Evergreen area.  This means that 16 of the 19 casings, or the overwhelming number of casings recovered, were fired by the assailants.

¶ 99        By contrast, of the three casings fired from yet a third gun--presumably the gun caught on video as the victims ran--one casing was found in the rear yard of the house two doors down from decedent's home, and only two were on the parking pad behind decedent's home, where the silver Volkswagen was found. The comparatively few shots apparently fired by the intended victims further reduces the likelihood that their one gun was the source of the fatal bullet.

¶ 100        While it is theoretically possible that the single fatal bullet could have come from the one gun fired by the victims, an overwhelming amount of evidence pointed to the assailants as the likely source. This evidence included the directions in which the two groups were both motivated to shoot, and were actually observed shooting, and the relative numbers of shots fired. A reasonable doubt does not mean the erasure of every theoretical possibility.  Further, on appeal, we consider only whether any rational trier of fact could have so found, and that question, as we noted above, must be answered with an unequivocal yes.

¶ 101        As the State acknowledged, the trial court erroneously stated that, of the three guns present at the shooting, one was a Luger. However, on appeal, when we consider a claim of

insufficient evidence, we evaluate the evidence anew, asking whether, based on the record before us, *any* rational trier of fact could have found defendant guilty beyond a reasonable doubt. *People v. Bush*, 2023 IL 128747, ¶ 33. As a result, the trial court's mistake about the Luger did not affect our analysis. It has been often said that no trial is perfect, and that a defendant is entitled to a fair trial, but not necessarily a flawless one. *People v. Redmon*, 2022 IL App (3d) 190167, ¶ 34; *People v. Bull*, 185 Ill. 2d 179, 214 (1998).

¶ 102　　　　For the foregoing reasons, we are not persuaded by the limited claim regarding sufficiency that defendant raises on appeal.

¶ 103　　　　　　　　　　　　　　II. Assistance of Counsel

¶ 104　　　　Defendant alleges that his counsel was ineffective. To determine whether defendant was denied his right to effective assistance of counsel, we apply the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland*). Under *Strickland*, a defendant must prove both (1) that his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness and (2) that, absent these errors, there was a reasonable probability that the outcome of the proceeding would have been different. *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 71.

¶ 105　　　　Under the first prong of the *Strickland* test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness, as measured against prevailing professional norms. *Carlisle*, 2015 IL App (1st) 131144, ¶ 72; see also *People v. English*, 2013 IL 112890, ¶ 34 (counsel's assessment of the merits of an issue "depends on the state of the law at the time" of the assessment). Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the

result of the proceeding would have been different. (Internal quotation marks omitted.) *Carlisle*, 2015 IL App (1st) 131144, ¶ 72. "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004).

¶ 106 To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Carlisle*, 2015 IL App (1st) 131144, ¶ 73. Thus, if one of the two prongs is missing, we need not consider the other one. In addition, our analysis does not have to proceed in any particular order. *Carlisle*, 2015 IL App (1st) 131144, ¶ 73.

¶ 107 Defendant makes no arguments on appeal based on the fact that his attorney asked to be relieved and makes no mention of this fact at all in his appellate briefs. Points not argued are forfeited. *Lozman v. Putnam*, 379 Ill. App. 3d 807, 824 (2008) (listing cases); Ill. S. Ct. R. 341(h)(7) ("Points not argued are forfeited and shall not be raised *** on petition for rehearing."). Even if he had, this fact would not change our analysis, since we do not decide this claim on the performance prong. We examine the prejudice prong first and find it lacking, as we explain below.

¶ 108 Defendant argues that his trial counsel was ineffective for failing to argue that the State failed to prove beyond a reasonable doubt that defendant or one of his codefendants fired the fatal bullet. In essence, this is a reframing of the issue that we already found unpersuasive above. Based on the evidence and testimony that we already discussed in the prior section, there is no reasonable possibility that this argument would have succeeded in changing the outcome of the trial and, hence, defendant cannot satisfy the prejudice prong. In the alternative, defendant argues that trial counsel failed to raise another defense without suggesting what that

defense might have been. It appears that appellate counsel cannot think of another one, and neither can we.

¶ 109    Lastly, with respect to prejudice, defendant asks us to take the extraordinary and unusual step of finding that the prejudice prong is satisfied based solely on counsel's deficient performance. In support, he cites the 1989 case of *People v. Caballero*, 126 Ill. 2d 248, 267 (1989). In the 1989 *Caballero* case, our supreme court discussed three prior Illinois Supreme Court cases in which "defense counsel abdicated his responsibility by directly admitting the defendant's guilt." *Caballero*, 126 Ill. 2d at 266-67. The supreme court found that, "in cases like" these three prior cases, "where counsel abandons even the pretense of defending his client, Federal constitutional standards or our own State Constitution may mandate reversal even in the absence of prejudice." *Caballero*, 126 Ill. 2d at 267. The court found that, by contrast, in the case in front of it, "counsel, far from conceding his client's guilt, vigorously argued in favor of his innocence" when counsel urged the jury in closing to find his client not guilty. *Caballero*, 126 Ill. 2d at 268.

¶ 110    Similarly, in the case at bar, defense counsel argued repeatedly in closing that his client was not guilty. Counsel argued that the State failed to prove beyond a reasonable doubt that his client was "responsible for a bullet that went through that window." Counsel argued that the State's "own evidence showed only two individual[s] jumping over" a particular fence and that "there was nobody who jumped over [that] fence with a red jacket." Counsel argued that it was unclear whether the victims were the ones who jumped over the fence since facial recognition was not good at that point. Lastly, counsel argued that conversations before and after did not create legal responsibility, but rather only an agreement could do that.

¶ 111    Counsel's argument was in addition to his objections during trial to: the mother's testifying without her counsel present, the admission of the videotaped interview of Antwon Williams, and the admission of information derived from a search of defendant's phone including Facebook messages and texts. Counsel also successfully argued before trial that the State's two pretrial motions were untimely. In light of counsel's argument and objections, the facts of this case do not warrant us taking the extreme step, based on dicta in *Caballero*, of merging the second prong of *Strickland* into the first prong to create a test with only one prong.

¶ 112    In the case at bar, we cannot find a reasonable probability that the outcome would have been different absent counsel's alleged errors. The police did a remarkable job, leaving no stone unturned in this case. The prosecution presented a mountain of evidence. Defendant concedes in his brief to us that the various surveillance videos "traced [defendant's] and his accomplices' movements almost minute-by-minute on the day of the shooting." This minute-by-minute video tracking, along with the ballistics evidence and the testimony of various event witnesses such as Vasquez, were more than sufficient to establish guilt, even without the Facebook messages that defendant challenges on appeal. It is doubtful that Perry Mason could have created a reasonable probability of a different outcome. As a result, we do not find defendant's ineffectiveness claim persuasive.

¶ 113                                III. Facebook Messages

¶ 114    Lastly, defendant argues that the Facebook messages constituted inadmissible hearsay where the State allegedly failed to prove that Curmiller Hayes, David Cervantes and Joseph Serrano used the Facebook names associated with certain messages, and that Detective Westerkamp was not qualified to translate gang terms appearing in the Facebook conversations. Defendant acknowledges that these claims are forfeited, but asks us to consider

them under the plain error doctrine or as ineffective assistance of counsel. As for ineffective assistance, we already considered that issue in the prior section and found it unpersuasive based on the prejudice prong.

¶ 115     When a defendant failed to preserve an error for appeal, we may still review the issue for plain error. *People v. Sebby*, 2017 IL 119445, ¶ 48; Ill. S. Ct. R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). To preserve an alleged error for appellate review, a defendant must have both specifically objected at trial and raised the specific issue again in a posttrial motion. *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 50. A defendant's failure to do one or both, as is the case here, results in forfeiture. *Sebby*, 2017 IL 119445, ¶ 48. However, the plain error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In a plain error analysis, it is the defendant who bears the burden of persuasion. *Sebby*, 2017 IL 119445, ¶¶ 51-52. The first step under either prong of a plain error analysis is to determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49.

¶ 116     Defendant argues (1) that the messages were not sufficiently authenticated as Facebook messages; (2) that the usernames associated with Hayes, Serrano and Cervantes were not sufficiently identified as their usernames; (3) that certain usernames were not identified; (4)

that the statements violated defendant's right to confrontation; and (5) that Detective Westerkamp was not qualified to explain the gang terms in the Facebook conversations.

¶ 117   With respect to defendant's arguments regarding insufficient authentication identification or qualification, the State responds that defendant invited the error by consistently volunteering "No objection" and that the State could have and would have cured these issues if defendant had not acquiesced. This response applies to arguments (1), (2) and (5) above.   Issues such as authentication, identification and qualification are particularly subject to the invited error doctrine. Where a party invites or acquiesces to a procedural error, that party is generally estopped from claiming on appeal that the trial court erred. *People v. Skinner*, 2025 IL App (4th) 240689, ¶ 46 (the plain error doctrine does not apply to affirmative acquiescence). Normally, a party authenticates, identifies or qualifies a witness or exhibit to the extent necessary to overcome any objection by the adverse party; and with no objection, the offering party simply moves on.   As a result, it is difficult for us to find that defendant has carried his burden of persuasion to show a clear or obvious error.

¶ 118   With respect to argument (3), the State acknowledges that certain usernames were not identified but argues that their messages were used primarily to provide a context for the co-conspirators' replies and messages. In light of the volume of messages to and from defendant and his co-conspirators, these errors were more of the *de minimus* variety and are not enough to satisfy defendant's burden to show a clear or obvious error. With respect to (4), the State argues that there was no confrontation clause violation, where defendant's messages and the messages of his co-conspirators were admissible as party admissions and co-conspirator statements. In his initial brief, defendant argued that these messages were testimonial hearsay that violated his sixth amendment right of confrontation. However, defendant made no

argument in reply to the State's argument that the admission of co-conspirator statements does not violate the confrontation clause, thereby effectively abandoning this point on appeal, which was also defendant's ground for claiming second-prong plain error. Defendant offered no argument in reply that any of the statements were made outside of the conspiracy, thereby also forfeiting this line of argument.

¶ 119    As defendant effectively conceded by the lack of a reply, co-conspirator statements are not hearsay. *People v. Caraga*, 2018 IL App (1st) 170123, ¶ 38. As we explain below (*supra* ¶¶ 121-125), defendant's agreement to and participation in this conspiracy were well established even without the Facebook evidence. *Carga*, 2018 IL App (1st) 170123, ¶ 39 (for a co-conspirator's statement to be admitted, the State must establish that a conspiracy existed with proof apart from the co-conspirator statements that are sought to be admitted).

¶ 120    With respect to (5), defendant's initial appellate brief asserted that no testimony was offered regarding Detective Jennifer Westerkamp's qualifications. In his reply brief, he conceded "her extensive history on the police force," but argued that she did not specifically testify about her street-gang experience. However, her testimony established that she was an over 11-year Chicago Police veteran, who had worked her entire career in the same geographic area, in principally "Violent Crimes" and "Homicide." When asked to explain what a particular slang term meant, she testified that she knew what it meant based on her "experience on the street and as a detective," as well as her experience interviewing offenders and witnesses. Again, it is difficult to find a clear or obvious error based on her alleged lack of qualification.

¶ 121    Not only has defendant failed to persuade us of a clear or obvious error, but he has also not persuaded us that, absent this evidence, the case was closely balanced. The purpose of the Facebook evidence was to further show an agreement or conspiracy. It was not used to identify

the assailants; the video evidence and witness testimony did that. It was not used to establish the likely trajectory of the fatal bullet; that was done by the ballistics and video evidence and related testimony. The purpose of the Facebook evidence was to further establish an agreement or conspiracy among defendant, Serrano and Cervantes, since the State could not prove which one of them fired the fatal bullet. 720 ILCS 5/5-2(a)(1)(c) (West 2022). (a person is accountable if "either before or during the commission of an offense, and with intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense)"

¶ 122    In response to the State's argument that defendant's agreement was well-established without the Facebook messages, defendant argues that the State's other evidence established only his mere presence. Rather than "mere presence," the State's video evidence established that, enroute to the shooting, the three assailants moved together as one unit--almost in circles. At 8:01 p.m. on the day of the murder, the three assailants--Serrano, Cervantes and defendant--exited Pacheco's residence and walked southbound on Rockwell, but then they walked back north, together. The three then walked south from Rockwell Street to Hirsch Street. However, after reaching Hirsch and Rockwell, the three walked in a sideways U-shape together: walking west on Hirsch, south on Washtenaw Avenue, and east on Evergreen Avenue--which brought them back to Rockwell. The three then walked south again on Rockwell toward Potomac. However, at 8:18 p.m., they walked back north on Rockwell, toward Evergreen, and turned left, or west, onto Evergreen, which was right behind the decedent's home. Their route was like a circuitous dance, executed together. "Because a conspiracy is almost never susceptible of direct proof, it may be established from circumstantial evidence and inferences drawn from all the surrounding facts and circumstances, including the accused's own words and acts,

coupled with commonsense knowledge of persons in similar circumstances." *People v. Caraga*, 2018 IL App (1st) 170123, ¶ 39.

¶ 123    In addition, the video evidence shows that defendant and Cervantes took turns carrying the bag, to and from the shooting.  At 8:03 p.m., Cervantes was carrying the sling bag.  However, at 8:08 p.m., defendant was carrying it.  After the shooting, as they were running away, defendant was still carrying the bag. Far from mere presence, the video evidence established that the three acted in unison, including carrying what they believed they needed as they headed toward the shooting.

¶ 124    Further, there is the testimony of Elizabeth Vasquez, a bystander who just happened to be outside smoking a cigarette when the shooting occurred.  Vasquez testified that, at the same exact moment when she heard a second round of gunfire, she saw two individuals running toward Rockwell Avenue, that one of them was wearing a brightly-colored red or orange hoodie, and that he was looking "back" and firing his gun. "Back," at that point, was toward the decedent's home. Defendant was repeatedly identified as the one of the three who was wearing the brightly-colored red hoodie, which this court has in front of us as part of the evidence on appeal.  In stark contrast to defendant's distinct red hoodie, Cervantes was in a gray sweatshirt that night, while Serrano was in a black hoodie.

¶ 125    Vasquez, a local insurance agent, was not cross-examined or impeached in any way, and her testimony of seeing two individuals running toward Rockwell Avenue, dovetailed with the testimony provided by Detective Brennan regarding the video evidence. Detective Brennan testified that a clip from a camera on Hirsch showed defendant and Cervantes running north on Rockwell at 8:22 p.m., one minute after the shooting. The detective explained that Serrano, who was in the lead, was out of view.

¶ 126    Moving in unison, carrying the bag to and from the shooting, and shooting a gun is not "mere presence." It was more than enough to establish defendant's active participation in the plan that the three of them carried out. Even without the Facebook evidence, we cannot find a close case.

¶ 127    For all the foregoing reasons, with respect to the Facebook evidence, we can find neither a clear or obvious error, nor a close case.

¶ 128                                   CONCLUSION

¶ 129    In sum, we do not find persuasive defendant's claims regarding insufficiency of the evidence, prejudice due to the ineffectiveness of trial counsel or erroneous admission of Facebook evidence and testimony.

¶ 130    Affirmed.