2025 IL App (1st) 232303-U

FIRST DIVISION
December 8, 2025

No. 1-23-2303

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | 19 CR 3310 |
| | ) | |
| JOHNNY GALLOWAY, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:   Defendant's conviction for first degree murder is affirmed; the trial court did not abuse its discretion in admitting testimony by a witness identifying defendant from surveillance video pursuant to Illinois Rule of Evidence 701; trial counsel did not provide ineffective assistance by failing to call a witness who might have undermined the identification; and the evidence is sufficient to prove defendant's guilt beyond a reasonable doubt.

¶ 2    The State charged defendant, Johnny Galloway, with first degree murder. Surveillance video captured the shooting. Prior to trial defendant filed a motion to bar the testimony of a lay witness identifying defendant on the video recording. Over the objections of defendant, the trial court admitted the testimony of the lay witness identifying defendant as the person on the surveillance video shooting the victim. Following a jury trial, the trial court convicted defendant

and imposed a sentence of 45 years' imprisonment. The court denied defendant's motion for a new trial. For the following reasons, we affirm.

¶ 3                                              BACKGROUND

¶ 4      In July 2018, when the victim, Clarence Dabney, stopped his car in the middle of a residential street, a person ran up to the driver's side of the vehicle, fired several shots into the open driver's side window, and fled on foot. The area in which the shooting occurred is a public housing development named ABLA Homes, or ABLA. Surveillance video captured the entire incident, including the offender fleeing on foot and images from the surrounding area before the shooting. There were no eyewitnesses to the shooting and no physical evidence that connected to any individual. By watching surveillance videos from multiple cameras, police identified a person, Medelin, who may have seen the offender flee the scene. Medelin was unable to make an identification of the shooter from a photo array that included defendant. Later, police identified Tyshon Shepard as a person who may be able to identify the shooter in the surveillance videos.

¶ 5      Prior to trial, defendant moved to exclude Shepard's testimony pursuant to *People v. Thompson*, 2016 IL 118667. Defendant's trial attorney argued that the face of the shooter is not visible in the video, and only the shooter's "clothes, body, hair, most notably, a pair of brown shoes, and a black track suit" are visible. Other surveillance videos from before the shooting show a face. Defendant's attorney argued *Thompson* allows an individual to testify as to the identity of a person in a surveillance video "if they have a sufficient history with the defendant to be able to make that call." However, the defense argued that in this case, Shepard should not be allowed to "look at the same video that the jury is going to look at and say that [is] defendant" because Shepard's familiarity is too remote and limited. The State responded, in part, that Shepard has known defendant his whole life, and "they grew up together."

¶ 6      The trial court denied the motion. At trial, Shepard testified that up to approximately seven to nine years prior to testifying, Shepard lived his entire life in Chicago in ABLA with his grandmother. Shepard did not live in ABLA on the day of the shooting but still visited relatives there "everyday" according to Shepard. Shepard testified that he has known defendant since they were children both living in the ABLA Homes. When Shepard lived in ABLA, he saw defendant "three to four days out of the week." Shepard and defendant played basketball and socialized together. Shepard identified defendant in court.

¶ 7      Shepard testified that he was not in ABLA Homes when the shooting occurred but was there long after the shooting after police left the area. Shepard testified that at the time of the shooting Shepard was a paid FBI informant. Shepard testified that he first became aware of the shooting after the Chicago Police Department (CPD) contacted the FBI. The FBI contacted Shepard, and together with CPD officers they had Shepard watch three video clips.

¶ 8      Shepard testified the victim was defendant's cousin. Shepard testified that he was unable to identify anyone when Shepard first viewed the video recording of the shooting because he "didn't watch the entire video. I closed my eyes. *** Because I didn't want to see nothing like that." Shepard also viewed a video the prosecutor described as "video of a suspect fleeing from the scene of the shooting." Shepard testified he was able to make an identification from the "fleeing" video. Shepard viewed a third series of video clips, of "a person in front of a house over inside the ABLA Homes" which Shepard identified as defendant's house. Shepard testified he recognized defendant in the third video.

¶ 9      Shepard testified that two days after police first showed Shepard the videos, Shepard met with police again and they showed him still images taken from the videos Shepard had watched. Shepard viewed the still images in open court and testified that when police showed him the

images Shepard identified defendant as the person in the still images. The State played the video clips of the shooting, which is comprised of two clips of the same event from two different angles, in open court, and asked if Shepard recognized the person doing the shooting. Shepard testified that person was defendant. The State also played two video clips showing the immediate vicinity before the shooting in open court. The first clip shows one person who Shepard identified as defendant. The second clip—from the same camera a few minutes later—shows two people, one of whom is pulling a wagon. Shepard identified the person pulling the wagon as defendant. The State played three video clips "from the area around the place [Shepard] knew [defendant] to live" recorded before the shooting. Shepard testified he saw defendant "walk through the parking lot towards his place" wearing "[b]rown boots, black and white striped jogging pants and a white t-shirt." The State played another clip of the area recorded approximately ten minutes later and Shepard identified defendant in that clip. Shepard testified this last clip of the area showed defendant's face and the person in the video was the person Shepard knows to be defendant.

¶ 10    The State also played the clip that it previously described as showing persons fleeing the scene at trial. Shepard testified he recognized defendant as one of the people who ran across the screen. Shepard testified that of the two people running in the video, defendant was the "guy with the black sports jacket, black and striped jogging pants, brown boots, white t-shirt." Shepard agreed that other than the jacket, that was the same clothing Shepard observed defendant wearing in each of the video clips Shepard viewed in court. Police reports state that during the investigation, Shepard identified an individual named Keejuan Taylor, who had the nickname "Chuck," as the second person running in the video with defendant. At trial, Shepard did not identify the second person seen running in the video with defendant. Shepard identified a

photograph, which the State showed Shepard for the first time on the day of trial, of Maurice Dabney. Shepard testified that the person in all of the videos Shepard watched and all of the photos Shepard viewed is not Maurice, it is defendant. Shepard testified that he was currently on probation for aggravated battery to a police officer and the State did not make any promises to Shepard regarding that case in exchange for Shepard's testimony in this case. The State did not pay Shepard any money for Shepard's testimony.

¶ 11    On cross-examination, Shepard denied ever selling or holding drugs in ABLA Homes and denied that he became an informant because he sold drugs. Shepard would not answer whether Maurice had long "dreads" (a hairstyle) in the photograph Shepard viewed at trial. (In the videos, the person identified as defendant has long dreads.) Shepard stated he never saw Maurice and defendant standing next to each other and did not know if they were the same height and build. Shepard again testified that he did not identify defendant the first time he watched the video of the shooting because he did not look at the shooting and testified that sometime after that first viewing, Shepard did watch the video again and identified defendant as the shooter. Shepard could not recall if that second viewing—when Shepard identified defendant—was before or after the State charged Shepard with aggravated battery to a police officer.

¶ 12    Detective Potter of the CPD testified that as part of the investigation into the shooting, he tried to identify the people in the videos by attempting to locate anyone with information surrounding ABLA Homes. Detective Potter contacted the FBI for assistance and as a result, Detective Potter was able to interview Shepard. Pertaining to Shepard's viewing of the videos, Detective Potter testified that when Shepard was shown the videos the first time, Shepard was not able to identify anyone from the video of the shooting or of two people running away; but,

Shepard did identify defendant in one of the clips taken from a camera mounted on an address that the detective testified defendant stated was his home. Detective Potter testified that when he interviewed Shepard the second time, two days later, Detective Potter showed Shepard two still images taken from the video clip of the two men running from the area after the shooting. One of those still images was the same view as the other image but "zoomed in." Shepard identified defendant in both of those photographs.

¶ 13    Detective Potter testified that when he interviewed defendant, he showed defendant videos and still images related to the shooting. Initially, defendant admitted recognizing the area but denied knowing the victim. Later in the interview, defendant stated that he did not recognize the area. Defendant denied recognizing the area or anyone shown in any of the still images.

¶ 14    On cross-examination, Detective Potter testified that defendant told Potter that defendant has a cousin, Maurice, who looks just like defendant. Based on a photo of Maurice, Detective Potter agreed Maurice had a "similar" hairstyle as the shooter and similar hair and facial hair as defendant near the time of the shooting. Detective Potter testified that during their first meeting Shepard did not "shield his face" or look away. When asked if Shepard watched the clips, Detective Potter testified, "I believe so." Detective Potter testified that Shepard stated that he could not see the face of the shooter and did not have "a clear enough facial view" of the person running away from the shooting. Shepard did identify defendant in a clip taken from the surveillance camera at what was identified as defendant's, or defendant's mother's, address. Detective Potter did not ask about or show Shepard any pictures of Maurice. Detective Potter agreed that "there were some individuals that wore long dreads" in that area at that time. When Detective Potter interviewed Shepard again two days after the first interview, Potter only recalled showing Shepard still photographs. Detective Potter testified that Shepard identified defendant

from a "zoomed in" still image from the video clip of one of the persons running away from the shooting and another still image, not zoomed in, from another surveillance camera; but Potter did not show Shepard a still image from the video clip of the actual shooting. When asked if Shepard ever identified the shooter, Detective Potter testified that Shepard "never identified a view of the shooting. He didn't identify anybody, correct."

¶ 15 The jury found defendant guilty of first degree murder. Defendant's trial attorney filed a motion for a new trial and subsequently withdrew as defendant's attorney because defendant made claims of ineffective assistance. Defendant retained a new attorney.

¶ 16 Defendant's posttrial attorney filed a supplemental motion for a new trial. Defendant's motion and supplemental motion for a new trial argued, relevant to this appeal, that (1) "the State failed to prove the Defendant guilty of the charges against him beyond all reasonable doubt," (2) the trial court erred in denying defendant's pretrial motion to exclude Shepard from giving "his opinion as to video identification," (3) defendant received ineffective assistance of counsel at trial based on defendant's trial attorney's failure to secure evidence to refute Shepard's testimony—including testimony by Shepard's brother [(Gregory Williams)] that Shepard did not grow up in ALBA Homes and that Shepard told Williams that Shepard made up the identification of defendant—and failure to call Keejuan Taylor to testify "to refute the allegation that [Shepard] *** was able to identify [defendant] and Taylor as individuals who were on the video contemporaneous with the shooting" because Taylor "would have refuted his being there along with [defendant] at the time of the alleged shooting." A July 18, 2018 police report attached to the motion for a new trial states that after viewing the video, Shepard stated that the male running with defendant was " 'Chuck.' " Using information provided, apparently from a

Facebook page belonging to "Chuck," police showed Shepard a picture of Keejuan Taylor. Shepard identified Taylor as Chuck. The trial court held a hearing on defendant's motion.

¶ 17    Taylor testified at the hearing that he grew up in the ABLA Homes from birth until age eight, and that his nickname is "Chuck." Taylor testified, "I know I wasn't there," in ABLA Homes on the day of the murder. When asked how he was certain he was not there, Taylor testified, "I mean, I know I wasn't there. I probably was doing something or outside somewhere." Taylor explained that by "outside" he was referring to work. Taylor testified that at no point did he run from a scene with defendant while defendant was shooting at someone.

¶ 18    According to Taylor, defendant's trial attorney never interviewed Taylor about the murder or where Taylor was on the day of the murder. No one, except defendant's posttrial attorney, talked to Taylor about allegedly being with defendant at the time the murder took place. On cross-examination, Taylor testified that on the day of the offense, "I was probably doing stuff outside;" by which he meant, "Like, I probably was at the lakefront, probably outside with my girlfriend or something." When asked about his earlier testimony about working Monday through Friday, 9:00 a.m. to 5:00 p.m. (the murder occurred midday on a Monday) and how he could reconcile that with his current testimony, Taylor said, "I said I could have been at the lakefront ***. *** I could have been doing anything. Like I could have been at work." But, Taylor testified, "I know for sure I wasn't in the ABLA Homes" because "I don't hang in the ABLA Homes. So I know for sure I wouldn't be out in the ABLA Home [j]ust in the ABLA Homes, no." Taylor testified the reason he is certain he was not in ABLA Homes that day is because he does not recall seeing or hearing gunshots being fired that day.

¶ 19    Gregory Williams, Shepard's brother, testified that during a conversation, Shepard told him that he was paid to identify defendant. Williams interpreted Shepard's statement that he was

paid to identify defendant to mean that Shepard lied about his identification. Shepard never said the words, "I lied." After the trial, Williams contacted defendant's family to tell them what Shepard told Williams.

¶ 20    Defendant's trial attorney also testified at the hearing. Defendant's trial attorney's strategy was that defendant could not be identified as the shooter because you could not see the shooter's face, and that Shepard was an unreliable witness because Shepard was being paid by the FBI. The trial attorney did not attempt to verify that the other person Shepard identified was actually there "because there was no way at the trial that I was ever going to bring up the fact that [Shepard] ID'd a second person. That would only bolster his credibility of ID'ing the first person." Later, the trial attorney testified that he "had no interest in bringing up the fact that [Taylor] was on the video or not because I believe it made Shepard's testimony more credible ***." Defendant's trial attorney also testified that he "had no information *** that [Taylor] was not in the ABLA Homes that day." When asked, "Are you aware that Mr. Shepard did not grow up in the ABLA Homes?" defendant's trial attorney responded, "Don't recall." The trial attorney conceded that if Taylor was, in fact, not at the ABLA Homes that day, it "possibly" would have undermined Shepard's credibility. Defendant's trial attorney had no recollection of Williams contacting him after trial or having a conversation with defendant about Williams.

¶ 21    The trial attorney stated that he did not have an independent recollection that Shepard identified Taylor as someone who was running with the person Shepard said was defendant. Defendant's trial attorney testified that he made no effort to locate Taylor because to tell the jury that Shepard identified someone else in the video, as well as defendant, would be "the complete opposite" of his strategy to argue that it is impossible to identify anyone from the videos, "that you couldn't tell that that was [defendant] in any of the videos," and that when Shepard did

identify defendant, it was a guess based on body type or was what police wanted to hear. Defendant's trial attorney testified that no evidence was presented at trial that Shepard identified Taylor, and that, "[g]iven my defense, I was not going to open the door to bolstering Shepard's ability to identify people from video one way or the other."

¶ 22    On cross-examination by defendant's posttrial attorney, defendant's trial attorney testified that he did not conduct an investigation into the veracity of Shepard's connection to defendant because "the connection *** was [Shepard] knew [defendant] from being around the ABLA Homes."

¶ 23    Defendant also testified at the hearing on the posttrial motion. Defendant testified that he only reviewed a summary of the discovery in this case prepared by the trial attorney and did not see the report identifying Taylor as the second man running in the video. Defendant suggested ways to impeach Shepard's testimony that Shepard grew up with defendant, including by asking Shepard for details about defendant's youth.

¶ 24    Following the hearing, the trial court found  that the trial attorney engaged in a "significant cross-examination" of Shepard. The court found that calling Taylor to testify went to trial strategy, and "there would be no point and it would not be somehow unreasonable not to do that." The court also found that Williams was not a credible witness. The court found that Williams's "assumptions, what he felt about his brother really [has] no relevance." The court also found that "not going into further cross about how [Shepard] knew [defendant] is trial strategy" particularly since Shepard "could have *** testified to that he knew [defendant] from the neighborhood as having dealings with drug dealing and things to that effect." The court also found that there was no evidence that really impeached Shepard's testimony as to how Shepard

knew defendant, but rather was corroborated, including, in part, by defendant. The trial court denied defendant's motion for a new trial.

¶ 25    This appeal followed.

¶ 26                                ANALYSIS

¶ 27    This is an appeal from defendant's conviction for first degree murder alleging (1) the trial court abused its discretion in admitting lay opinion identification testimony, (2) defendant received ineffective assistance of counsel based on counsel's failure to challenge the identification, and (3) the evidence was insufficient to prove defendant's guilt beyond a reasonable doubt.

¶ 28                A. Admissibility of Lay Opinion Identification Testimony

¶ 29    We first address defendant's argument that the trial court abused its discretion in admitting Shepard's identification testimony because that testimony was not "helpful" under Illinois Rule of Evidence 701. "A court reviews the trial court's decision to admit lay opinion identification testimony under an abuse of discretion standard." *People v. Thompson*, 2016 IL 118667, ¶ 49. "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court." *People v. Colone*, 2024 IL App (1st) 230520, ¶ 56.

¶ 30    The admissibility of lay opinion identification testimony is controlled by Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) and our supreme court's decision in *Thompson*. Evidence Rule 701 provides:

> "If the witness is not testifying as an expert, the witness' testimony in the
> form of opinions or inferences is limited to those opinions or inferences which are
> (a) rationally based on the perception of the witness, and (b) helpful to a clear

understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 31    The issue in this case is whether Shepard's lay opinion is "helpful" to the jury. "Lay opinion identification testimony is *helpful* to a determination of whether the individual depicted in a surveillance recording is the defendant where 'there is some basis for concluding that the witness is more likely to correctly identify the defendant *** than is the jury.' [Citations.]" (Emphasis added.) *Thompson*, 2016 IL 118667, ¶ 41. The evidence must establish that the witness had adequate contact with the defendant to provide a sufficient level of familiarity with the defendant in order to establish "some basis" that it is more likely for the witness to correctly identify the defendant. See *id*. ¶ 42. That level of familiarity need not come from sustained contact or special knowledge of the defendant. *Id.* Whether the witness has the sufficient level of familiarity with the defendant to provide a basis for concluding that the witness is more likely to correctly identify the defendant than the jury—*i.e*., to make the witness's lay opinion "helpful"— is based on the totality of the circumstances considering several factors. *Id.* ¶ 43. "The existence of one or more of [those] factors indicates there is some basis for concluding that the witness is more likely to correctly identify the defendant from the [image] than is the jury. [Citations.]" (Internal quotation marks omitted.) *Thompson*, 2016 IL 118667, ¶ 49.

¶ 32    The factors a court should consider to determine whether, under the totality of the circumstances, "there is some basis for concluding [that] the witness is more likely to correctly identify the defendant" are:

(1) the witness's general familiarity with the defendant;

(2) the witnesses' familiarity with the defendant at the time the recording was made or where the

    witness observed the defendant dressed in a manner similar to the individual depicted in the

    recording;

(3) whether the defendant was disguised in the recording or changed his/her appearance between

    the time of the recording and trial; and

(4) the clarity of the recording and extent to which the individual is depicted.

*Thompson*, 2016 IL 118667, ¶ 51.

¶ 33    If there is some basis for concluding that the witness is more likely to correctly identify

the defendant from the images than the jury, then the lay opinion identification testimony is

helpful under Evidence Rule 701(b). See *Thompson*, 2016 IL 118667, ¶ 50. "[T]he absence of

any particular factor does not render the testimony inadmissible." *Id.* ¶ 51. "Moreover, it has

often been held that the extent of a witness's opportunity to observe the defendant goes to the

weight to be given the testimony, not its admissibility." *Id.* ¶ 49.

¶ 34    Our supreme court held that "[i]f [lay opinion identification] testimony is admitted under

the above standards [(including Rule 701(a))], it would not invade the province of the jury

because the jury is free to reject or disregard such testimony and reach its own conclusion

regarding who is depicted in the surveillance recording." *Thompson*, 2016 IL 118667, ¶ 54.

Nonetheless, where "lay identification testimony is admissible *** 'it may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice.' Illinois Rule of

Evidence 403 (eff. Jan. 1, 2011)." *Thompson*, 2016 IL 118667, ¶ 54. The erroneous admission of

lay opinion identification testimony is subject to a harmless error analysis. *Id.* ¶ 67 ("we find any

error in admitting this testimony harmless"). We may consider the evidence presented at trial to

determine whether the trial court abused its discretion in admitting lay opinion identification testimony. See *Thompson*, 2016 IL 118667, ¶ 60.

¶ 35    Defendant argues that Shepard's testimony was not "helpful" under *Thompson* because, although defendant admits Shepard testified that Shepard has some familiarity with defendant, that familiarity is subject to " 'source confusion or source monitoring error' " under *State v. Lawson*, 352 Or. 724, 743, 291 P.3d 673, 686-87 (2012). Defendant also argues that because the jury had the same opportunity to compare the other images showing defendant in the area to the image of the shooter, Shepard's testimony invaded the province of the jury and denied the jury a fair opportunity to reach the conclusion that the person in the other images was the person in the video of the shooting. Defendant also argues that there was no evidence "as to whether Shepard had seen [defendant] at any other point in the five years before the shooting."

¶ 36    Defendant argues the third and fourth factors weigh against Shepard's lay opinion identification testimony being "helpful" because the shooter was not disguised, and the jury could see defendant's change in appearance based on viewing defendant's arrest photo and video of defendant's interrogation compared to how defendant appeared in court (without dreads and with a beard). Finally, defendant argues the clarity of the images of the shooting weighs against Shepard's testimony being helpful in that Shepard was not more likely to correctly identify the shooter because Shepard admitted he could not see the face of the shooter. It was only after viewing other images of defendant that Shepard was able to identify defendant as the shooter. (We deem this argument a return to defendant's "source confusion or source monitoring error" argument.)

¶ 37    The State responds the first, fourth, and fifth *Thompson* factors all weigh in favor of admitting Shepard's testimony, which was "more than enough." As to defendant's argument

regarding the first (and fifth) factor regarding "source confusion or source monitoring error" the State argues that defendant's argument that Shepard's identification invaded the province of the jury under *Lawson* is answered by our supreme court's holding that admitting lay opinion identification testimony pursuant to the standards outlined in *Thompson* conclusively does not invade the province of the jury. *Thompson*, 2016 IL 118667, ¶ 54.

¶ 38     We agree with the State that *Lawson* is inapposite. *Lawson* is foreign authority and, in light of our supreme court's decision in *Thompson*, has no weight—not even persuasive weight—in this court. *Colone*, 2024 IL App (1st) 230520, ¶ 65 ("decisions from foreign jurisdictions are not binding in Illinois. [Citation.] 'Although comparable decisions from other jurisdictions may be considered for their persuasive value, "[w]hen there is Illinois case law directly on point, we need not look to case law from other states for guidance" ***.' [Citations.]"). Even were we to consider *Lawson*, it has no application here. Although not discussed in *Lawson*, we note this was not a "stranger" identification to which the concerns raised in *Lawson* are more applicable. § 12:51. Variables affecting eyewitness identification, Psychological and Scientific Evidence in Criminal Trials § 12:51 n.9 (listing multiple viewings as a system variable that influences identification and pointing out that, "identification of strangers would be of the type of identification that would fall into the 'questionable' category"), see *People v. Krentkowski*, 2025 IL App (1st) 232390-U, ¶ 89 ("Dr. Loftus testified that witnesses can identify acquaintances more easily and more quickly than strangers."). Regardless, this case does not present a situation where "police ask a witness to participate in multiple identification procedures" the result of which is that the suspect may "appear familiar *** as a result of the prior lineup, especially when the suspect is the only person who appeared in both lineups." *Lawson*, 291 P.3d at 686-87. Shepard did not view multiple images of multiple suspects

in which defendant was the only common suspect. Compare *id.* Shepard looked at video recordings, then looked at still images from those recordings two days later, and identified the person in those images as defendant. We do not find that the identification procedure used in this case rose to the level of suggestiveness *Lawson* addressed. Moreover, Shepard did not testify that he merely recognized the individual in the shooting video, Shepard testified the person in the shooting video was someone he knew independently of the offense: defendant.

¶ 39 Defendant has pointed to no evidence that Shepard identified defendant as the shooter because Shepard had recently seen images of defendant in the same context as the shooting or near what Shepard knew to be defendant's home beyond speculation and surmise. "A defendant cannot rely on speculation or conjecture to justify his claim of incompetent representation." *People v. Pecoraro*, 175 Ill. 2d 294, 324 (1997). Shepard testified he grew up with defendant and recognized him in the shooting video. It was for the jury to weigh the credibility of that testimony. In doing so, the jury was aware of Shepard's initial inability to identify defendant from the video of the actual shooting. Nonetheless, the jury could reasonably credit Shepard's testimony. *People v. Conway*, 2023 IL 127670, ¶ 16 ("we will not substitute our judgment for that of the trier of fact on questions involving the *** credibility of witnesses").

¶ 40 Further, Shepard was just as likely to be able to identify defendant after seeing the other images based on the shooter's physical attributes and movements other than seeing the shooter's face. Defendant has pointed to no authority that an identification based on those factors is inappropriate. To the contrary, our supreme court cited favorably *State v. Barnes*, 212 P.3d 1017, 1021-1023 (Ct. App. Idaho 2009), in which the Court of Appeals of Idaho noted that " 'individuals identify people from many factors.' *** We consider hair patterns, we consider posture. We consider unique movements, or expressions. We consider all types of things in

determining whether or not somebody is who we perceive them to be." *Barnes*, 212 P.3d at 1024. Defendant has failed to establish that Shepard's identification of defendant resulted from "source confusion." Defendant argued that the "source confusion of Shepard's identification makes his opinion *** far more prejudicial than probative." Because we reject defendant's "source confusion" argument, we also reject defendant's argument that Shepard's identification was more prejudicial than probative.

¶ 41    Turning to the factors our supreme court articulated for the admissibility of lay opinion identification testimony in this state, the State argues that the first factor—Shepard's general familiarity with defendant—weighs in favor of admitting Shepard's testimony because Shepard testified that he grew up with defendant. Defendant argues that "under the totality of the circumstances, Shepard's lack of familiarity shows his identification of [defendant] on video was not helpful to the jury." Our supreme court held that "a lay witness need only have sufficient contact with the defendant, which the jury would not possess, to achieve a level of familiarity that renders the lay opinion helpful" (*Thompson*, 2016 IL 118667, ¶ 42), and "[t]he existence of *one* or more of these factors indicates there is ' "some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." [Citation.]' " ((Emphasis added.) *id.* ¶ 49).

¶ 42    Shepard testified as to his familiarity with defendant. Although defendant challenges the truthfulness of Shepard's testimony, it was for the trier of fact to determine Shepard's credibility. *Conway*, 2023 IL 127670, ¶ 16. Furthermore, the evidence was that Shepard has family in ABLA Homes, and Shepard may have visited there and encountered defendant. We note that despite defendant's implication that Shepard would be unable to identify what schools defendant went to or what teams defendant played on, Shepard only testified to knowing defendant from "growing

up" together, not from going to school together or from playing organized basketball together. Even if Shepard had a more limited opportunity to observe defendant, or if Shepard's observations of defendant were not recent, our supreme court was clear "that the extent of a witness's opportunity to observe the defendant goes to the weight of the testimony, not its admissibility." *Thompson*, 2016 IL 118667, ¶ 53. We find that Shepard's general familiarity with defendant provides some basis for finding that Shepard was more likely to correctly identify defendant from the video of the shooting than the jury.

¶ 43    Next, the State argues that defendant did change his appearance from the time the images were taken to the time of trial; thus, this factor supports admission of Shepard's testimony. Defendant cites no authority for his argument that this factor weighs against admissibility because the jury could observe his change in appearance through photographs. The Seventh Circuit's holding in *U.S. v. Jackson*, 688 F.2d 1121 (7th Cir. 1982), suggests the opposite. In *Jackson*, the Court noted that "the jury could compare the defendant's appearance at trial to his appearance in the *** photographs in order to discern whether or not the defendant had attempted to alter his appearance further ***." *Id.* at 1126. Nonetheless, the court found that it could not conclude that the witness's testimony "was not 'helpful to a clear understanding of *** the determination of a fact in issue' " under Federal Rule of Evidence 701(b). *Id.*

¶ 44    The State argues the fifth factor supports admission because the shooter's face is not visible in the recording of the actual shooting, but "the shooter's physical attributes including body style; skin color; hair style and distinctive clothing were visible." We have already rejected defendant's "source confusion" argument. *Supra*, ¶ 40. Defendant also complains that the trial court did not review the video to determine its clarity. Defendant cites no authority and provides no argument in support of his argument based on that fact. There is no dispute the video of the

shooting does not show the shooter's face. We find that the clarity of the video is a factor that weighs in favor of Shepard being more likely to correctly identify defendant from the video of the shooting than the jury. The absence of any other factors does not render Shepard's testimony inadmissible, so we decline to address them. *Thompson*, 2016 IL 118667, ¶ 51.

¶ 45    Finally, defendant argues that the admission of Shepard's testimony was not harmless in light of "the critical role the State gave to Shepard's testimony." Defendant concedes the State "did perfunctorily invite the jury to review the surveillance tape and make its own decision" but defendant argues that was not enough given the weight the State gave to Shepard's identification and the length of the jury's deliberations. We disagree. In this case, the trial court instructed the jury as follows:

> "You have before you evidence that a witness made an identification of
> the defendant from a video recording and photographs. It is for you to determine
> whether the witness made an identification, and, if so, what weight, if any, should
> be given to that evidence. In determining what weight to be given to this
> evidence, you should consider all of the facts and circumstances under which the
> identification was made, including, but not limited to, the procedures used by the
> law enforcement agency."

¶ 46    In *Thompson*, our supreme court found that any error in the admission of lay opinion identification testimony was harmless, partially because "the jury was repeatedly told by both attorneys and instructed by the court that it was up to the jury to make the ultimate determination of whether defendant was the individual depicted on the video. And, as the State points out, the jury viewed the video twice during deliberations." *Thompson*, 2016 IL 118667, ¶ 70. In this case, the jury had access to all of the same images and the jury was instructed that it had the obligation

to "determine whether the witness made an identification and \*\*\* what weight, if any, should be given to that evidence." (Emphasis added.). The instruction provided to the jury stated that the jury was not required to give any weight to Shepard's identification. "The jury is presumed to follow the instructions that the court gives it." *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). Therefore, like in *Thompson*, the ultimate determination was up to the jury.

¶ 47    The admission of Shepard's testimony is supported by the evidence and is not arbitrary or unreasonable. Defendant's attack on Shepard's identification does not create a reasonable doubt of defendant's guilt. The trial court did not abuse its discretion in admitting Shepard's lay opinion identification testimony. Even if the trial court had erred, that error was harmless under *Thompson*.

¶ 48    Nor do we find that the probative value of Shepard's testimony is substantially outweighed by the danger of unfair prejudice. Defendant argues that Shepard's testimony "created an unreasonable risk that the jury would abdicate its most critical task of judging for themselves." We must disagree. Our supreme court held that if lay opinion identification testimony is admitted under the standards articulated in *Thompson*, it would not invade the province of the jury because the jury is free to reject or disregard such testimony and reach its own conclusion regarding who is depicted in the surveillance recording." *Thompson*, 2016 IL 118667, ¶ 54. Defendant does not dispute that Shepard's testimony is rationally based on Shepard's perception. For the reasons stated above, Shepard's testimony was helpful to a determination of a fact in issue—the identity of the shooter in the recording—because Shepard had contact with defendant, that the jury did not possess, which provided a basis for concluding that Shepard was more likely to correctly identify defendant from the surveillance recording than the jury. *Id.* ¶¶ 49-50. Because the trial court properly admitted Shepard's testimony under the

standards stated in *Thompson*, there was no unreasonable risk that the jury would abdicate its most critical task of judging for themselves. *Id.* ¶ 54. Defendant's argument of unfair prejudice fails.

¶ 49                                    B. Ineffective Assistance of Counsel

¶ 50    Defendant argues that his trial attorney provided ineffective assistance of counsel because the trial attorney failed to investigate Taylor and present Taylor's testimony that he was not the person seen running with defendant in the surveillance video to undermine Shepard's identification of defendant and to support the trial attorney's strategy to argue that no one could be identified from the videos of the shooting or the two men running away.

¶ 51    In most cases the record is not sufficiently developed to evaluate an ineffective assistance claim on direct appeal. However, in this case a hearing was conducted on defendant's posttrial motion by the trial court where the trial attorney testified about his alleged deficient performance. We find that the record is sufficient to evaluate this claim. For the following reasons we find defendant has failed to demonstrate deficient performance by the trial attorney or prejudice from his alleged deficient performance.

¶ 52    "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant. [Citations.] To establish deficient performance, a defendant must show that his counsel's performance fell below an objective standard of reasonableness." (Internal quotation marks omitted.) *People v. Griffin*, 2024 IL App (1st) 191101-C, ¶ 37.

> "Prejudice is demonstrated if there is a reasonable probability that, but for
> counsel's deficient performance, the result of the proceeding would have been
> different. [Citation.] A reasonable probability is a probability sufficient to

undermine confidence in the outcome, namely, that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. [Citations.] The defendant must overcome a strong presumption that his lawyer's conduct falls within the wide range of reasonable professional assistance." *People v. Makiel*, 358 Ill. App. 3d 102, 105-06 (2005).

¶ 53　"Attorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *Makiel*, 358 Ill. App. 3d at 107. "An attorney who fails to conduct reasonable investigation, fails to interview witnesses, and fails to subpoena witnesses cannot be found to have made decisions based on valid trial strategy." *Id.*

"However, 'the reasonableness of a decision to investigate is assessed applying a heavy measure of deference to counsel's judgment.' [Citation.] An attorney who forgoes further investigation is not ineffective '[w]here the circumstances known to counsel at the time of his investigation do not reveal the sound basis for further inquiry in a particular area.' [Citation.]" *Griffin*, 2024 IL App (1st) 191101-C, ¶ 39 (quoting *People v. Orange*, 168 Ill. 2d 138, 149-50 (1995)).

¶ 54　Defendant argues that it was unreasonable for the trial attorney to choose not to present Taylor as a witness without first interviewing Taylor. Defendant cited *Makiel* for the proposition that an attorney who fails to conduct a reasonable investigation cannot be found to have made decisions on valid trial strategy. *Makiel*, 358 Ill. App. 3d at 107. In *Makiel*, much like this case, the defendant argued that he received ineffective assistance of counsel at trial because trial counsel should have called an available witness who "denied being with [the] defendant and [a

former codefendant] the night of the murder, thus undermining the State's theory of the case."
(Internal quotation marks omitted.) *Makiel*, 358 Ill. App. 3d at 106.

¶ 55    *Makiel* involved a postconviction petition at the second stage. *Id.* at 106. The court found that the allegations of the petition raised questions of fact that required an evidentiary hearing. *Id.* at 108, 109. Specifically, the court found questions of fact as to why the defendant's trial attorney did not contact the witness and "whether it was sound trial strategy for defense counsel not to subpoena [the witness] or call him as a witness." The court similarly found that "[t]here are questions of fact as to whether the failure to call [the] witness rendered the trial fundamentally unfair" under the prejudice prong. *Id.* at 109. The court concluded that the "record as developed *** reflects no strategic reason for defense counsel's failure to contact, interview, subpoena, and call [the] witness." *Id.*

¶ 56    In this case, the trial court held an evidentiary hearing on defendant's motion for a new trial. Defendant's trial attorney explained his lack of investigation of Taylor at the hearing on defendant's motion for a new trial. *Supra*, ¶ 20-21. Unlike *Makiel*, there is no question as to why defendant's trial attorney did not investigate Taylor: the choice was strategic. "Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Manning*, 241 Ill. 2d 319, 327 (2011). "There is a strong presumption that counsel's actions or inactions—such as the decision not to present certain arguments or not to call witnesses— constitute sound strategy. [Citation.] To prove otherwise, a party must show that counsel's decision was so irrational and unreasonable that no reasonably effective attorney, facing like circumstances, would pursue such a strategy. [Citation.]" *People v. Reyes*, 2025 IL App (2d) 240172, ¶ 26. Defendant has not met that burden. The trial attorney provided a reasonable strategic reason not to investigate Taylor. Taylor's testimony had the potential to bolster

Shepard's credibility and undermine the trial attorney's theory of defense. The risk that the jury would not believe Taylor and that Taylor's testimony would have the effect of bolstering Shepard's testimony would have been present even had defendant's trial attorney investigated Taylor and called Taylor as a witness. In its discussion, the *Makiel* court stated that, "[w]hether defense counsel was ineffective for failure to investigate is determined by the value of the evidence that was not presented at trial and the closeness of the evidence that was presented." *Makiel*, 358 Ill. App. 3d at 107. We find that trial counsel's strategy was rational and reasonable and did not undermine defendant's right to a fair trial. See *Pecoraro*, 175 Ill. 2d at 324-25 ("[i]t was entirely reasonable for counsel to focus his strategy on the weaknesses in the State's case rather than developing a speculative theory").

¶ 57    Furthermore, in *Orange*, 168 Ill. 2d at 149, our supreme court found that "[c]ounsel has only a duty to make reasonable investigations or to make a reasonable decision which makes particular investigations unnecessary." "Where the circumstances known to counsel at the time of his investigation do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation." *Id.* at 150. Our supreme court held that "[i]n light of [a] lack of corroborative evidence, defendant fails to demonstrate that the scope of the investigation trial counsel conducted was unreasonable." *Orange*, 168 Ill. 2d at 151.

¶ 58    In this case, defendant's trial attorney testified that he had no information that Taylor was not in ABLA Homes on the day of the murder. Although defendant complains on appeal that the trial attorney did not try to find out, in *Orange*, our supreme court looked to what counsel knew "at the time of [their] investigation," not what they might have learned later. See *Orange*, 168 Ill. 2d at 150. Based on what counsel knew at the time of his investigation, defendant has failed to demonstrate that "the scope of the investigation trial counsel conducted was unreasonable."

*Orange*, 168 Ill. 2d at 150-51. Taylor's testimony had the potential to bolster Shepard's credibility and undermine the defense, and the trial attorney was not going to take that chance. We find that this was "a reasonable decision which [made] particular investigations [into Taylor] unnecessary." *Orange*, 168 Ill. 2d at 149. Defendant's trial attorney's performance did not fall below an objective standard of reasonableness. *Id.* at 150.

¶ 59     Moreover, as in *Orange*, "defendant's claim fails because [defendant] does not demonstrate that he was prejudiced by the breadth of trial counsel's investigation." *Orange*, 168 Ill. 2d at 151. "To prevail on a claim of ineffective assistance of counsel based on a failure to investigate, defendant must show that substantial prejudice resulted and that there is a reasonable probability that the final result would have been different had counsel properly investigated." *Orange*, 168 Ill. 2d at 151. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome' [Citation.]" (*People v. Logan*, 2024 IL 129054, ¶ 82 (quoting *Strickland*, 466 U.S. at 694)), "meaning a 'substantial' likelihood of a different result, not just a 'conceivable' possibility" (*Wand v. Kramer*, 143 F.4th 823, 836 (7th Cir. 2025)). "[O]r put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *In re D.F.*, 2025 IL App (1st) 240914, ¶ 105.

¶ 60     In *Orange*, our supreme court found that even if trial counsel had conducted a broader investigation, "it is unlikely that such an investigation would have changed the outcome." *Id.* Similarly, here, there is a lack of evidence to support defendant's argument that Taylor would have undermined Shepard's credibility and bolstered the defense that Shepard could not identify anyone from the shooting video or the video of the two men running from the scene. Although Taylor testified that he was not in ABLA on the day of the shooting, Taylor's testimony was at worst inconsistent and inconclusive at best. Taylor first testified he was at work; he then said that

he was with his girlfriend; then Taylor testified he may have been either at work or with his girlfriend, but in any event, he does not remember being in ABLA on the date of the murder when shots were fired. Defendant argued that "the presentation of a concrete misidentification goes to the heart of defense counsel's strategy and undermines the State's argument that Shepard was able to reliably identify individuals from the video." Defendant's assertion that Taylor could have provided evidence of "a concrete misidentification" is an overstatement. Taylor did not provide "concrete" evidence to rebut Shepard's identification. *People v. Robinson*, 2020 IL 123849, ¶ 60 ("For new evidence to be positively rebutted, it must be clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible."). We agree with defendant that Taylor's testimony did not have to completely exonerate defendant; but given the discrepancies in his testimony and absent other evidence to positively rebut Shepard's identification, we find Taylor's testimony had very little value and was unlikely to rebut Shepard's identification. Therefore, we do not find that there is a reasonable probability—*i.e.*, one that undermines our confidence in the outcome—of a different result.

¶ 61    Defendant has failed to satisfy either prong of the *Strickland* test. Defendant's claim of ineffective assistance of trial counsel fails.

¶ 62                               C. Sufficiency of the Evidence

¶ 63    Finally, we reject defendant's argument that the State's evidence did not prove defendant guilty beyond a reasonable doubt. When considering a challenge to the sufficiency of the evidence, a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Gray*, 2024 IL 127815, ¶ 20.

¶ 64　To demonstrate the insufficiency of the evidence, defendant attempts to discredit Shepard's identification of defendant, and argues that defendant's appearance is similar to that of his cousin, Maurice, but police did not show Shepard photos of Maurice for comparison before trial. (Although Shepard did testify at trial that Maurice is not the person in the videos.) Defendant further argues that Medelin never identified defendant as the shooter, there are no eyewitnesses to the shooting, and there is no physical evidence. The State responds that in addition to the videos, defendant displayed a consciousness of guilt in his interviews with police by defendant's shifting statements about recognizing the neighborhood or himself in the videos and still images, thereby corroborating Shepard's identification. The State also argues that "all [Shepard] did was put a name to the face for police;" the jury observed the same images as Shepard and could determine for itself whether the person from the images in the neighborhood was the same person who shot the victim.

¶ 65　We find that the evidence was sufficient to prove defendant's guilt beyond a reasonable doubt. The testimony of a single eyewitness, if credible, is sufficient to sustain a conviction. *People v. Harris*, 2018 IL 121932, ¶ 27 ("This court has consistently held that the testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is contradicted by the defendant."). Here, the evidence included surveillance video of the crime being committed. If the testimony of a single, credible eyewitness is sufficient to sustain a conviction, defendant has offered no grounds on which to find that surveillance video is not. *United States v. Foy*, 50 F.4th 616, 625 (7th Cir. 2022) (finding that the "evidence at trial, specifically the surveillance video footage, clears the bar for sufficient evidence" to sustain a

conspiracy conviction), see also *People v. Bagley*, 2017 IL App (1st) 141614-U. Therefore, we find that the absence of physical evidence or other eyewitnesses does not raise a reasonable doubt of defendant's guilt. *Harris*, 2018 IL 121932, ¶ 27.

¶ 66      We agree with the State that "the jury, by their verdict, concluded that defendant was the person depicted in the video." "We will set aside a conviction only where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. [Citation.] All reasonable inferences are drawn in favor of a finding of guilt. [Citation.]" (Internal quotation marks omitted.) *People v. Bush*, 2023 IL 128747, ¶ 33. The jury heard the evidence and arguments against Shepard's credibility as a witness generally and the believability of his identification of defendant specifically. The jury's verdict reflects its judgment that Shepard was credible and that his identification should be afforded some weight. There are many reasons why the jury could reasonably credit Shepard's testimony that Shepard recognized defendant in the video of the shooting, not least of which being that Shepard has known defendant for defendant's entire life. See *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) ("a reviewing court may not allow unreasonable inferences. [Citation.] It follows that if only one conclusion may reasonably be drawn from the record, a reviewing court must draw it even if it favors the defendant."). Finding that Shepard is not credible is not the only reasonable inference that may be drawn from the evidence. We do not find that the jury's assessment of Shepard's credibility is so unreasonable or unsatisfactory that it creates a reasonable doubt of defendant's guilt.

¶ 67      Defendant argued that the evidence is insufficient because the "thrust of the State's case relied on Shepard's identification of [defendant] after [Shepard] viewed videos of other locations around ABLA homes related to [defendant.]" Defendant argues that because the video did not

show defendant's face, Shepard "did not credibly implicate [defendant] as the shooter."

Defendant asks this court to reject the jury's verdict based on the identification by Shepard, which the jury did not have to rely on to find defendant guilty. Our supreme court recognized that it is for the jury to determine if the person depicted in surveillance images is the defendant, and the admission of lay opinion identification testimony in compliance with its guidelines does not invade the province of the jury to do so. *Thompson*, 2016 IL 118667, ¶ 54 ("If such testimony is admitted under the above standards, it would not invade the province of the jury because the jury is free to reject or disregard such testimony and reach its own conclusion regarding who is depicted in the surveillance recording.").

¶ 68    In this case, the instruction provided to the jury stated that the jury was not required to give any weight to Shepard's identification; therefore, like in *Thompson*, the ultimate determination was up to the jury. Therefore, defendant's attack on Shepard's identification does not create a reasonable doubt of defendant's guilt. We will not substitute our judgment for that of the jury, and that is true if the jury determined that Shepard was credible and afforded weight to his testimony. *People v. Barnett*, 226 Ill. App. 3d 397, 408 (1992) ("Any conflicts or inconsistencies in the testimony of witnesses go to questions of the weight of the evidence and the credibility of the witnesses."). Nor will we substitute our judgment for that of the jury where it was instructed to independently review the images, and it determined as a fact that the person from the images from the neighborhood (about whom there is no genuine dispute is defendant) is the person in the video of the shooting. *People v. Weeks*, 2011 IL App (1st) 100395, ¶ 27 (our "supreme court has long cautioned that 'the appellate court should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from

the evidence which did not greatly preponderate either way.' [Citation.]"). We find that the

evidence is sufficient to prove defendant guilty beyond a reasonable doubt.

¶ 69                               CONCLUSION

¶ 70     For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 71     Affirmed.